747 A.2d 625

**CHESAPEAKE CHARTER, INC., et al.**

**v.**

**ANNE ARUNDEL COUNTY BOARD OF EDUCATION.**

**No. 86, Sept. Term, 1999.**

Court of Appeals of Maryland.

March 7, 2000.

130

Joseph G. Billings (Law Offices of Joseph G. Billings P.C., on brief), Landover, for appellants.

William A. Kahn, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland and Valarie Cloutier, Asst. Atty. Gen., on brief), Baltimore, for appellee.

B. Darren Burns, Staff Atty. (Anne Arundel County Bd. of Educ., on brief), Annapolis, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

Before us is a procurement dispute between three school bus contractors, appellants here, and the Anne Arundel County Board of Education, appellee. The precise issue is whether the Maryland State Board of Contract Appeals (MSBCA), created to resolve disputes arising under the State General Procurement Law, has jurisdiction over that dispute. The larger question, which the parties agree governs that issue, is whether the procurement of services by a county board of education is subject to the General Procurement Law. We shall answer that question in the negative and thus affirm the judgment of the Circuit Court for Anne Arundel County which, in turn, affirmed MSBCA's dismissal of the procurement protest by the bus contractors.

### PROCEDURAL BACKGROUND

For many years, appellee obtained much of its student transportation services through contracts negotiated and entered into with individual bus contractors, each contract covering one or more routes. In 1997, the board decided to use a different approach, involving sealed competitive bids for longer-term, multi-route contracts. On November 3, 1997, it formally solicited bids for four groups of bus routes, each group containing five routes. Two pre-bid conferences were held, and, as a result of questions and concerns raised by prospective bidders, five amendments and clarifications were issued and an initially scheduled bid opening was postponed.

On February 2, 1998—one day before the rescheduled bid opening—18 prospective bidders, still dissatisfied, sent a protest letter to the board's purchasing officer complaining (1) about certain substantive specifications, including a minimum wage requirement for bus operators and aides, and (2) that the board's bidding procedures did not comply with the requirements of the General Procurement Law. Joined by some other bus contractors, they also filed suit in the Circuit Court for Anne Arundel County to restrain the board from opening the bids. That suit was voluntarily dismissed, without prejudice, after the court denied their request for a preliminary injunction. The board opened the bids as scheduled, and, on February 18, it formally awarded contracts for three of the four route groups. The bids for one route group were rejected because they were too high.

Treating the opening of the bids as an implicit denial of their protest, and without waiting for either an award of the contracts or a formal denial of their protest, appellants, on February 12, filed a Notice of Appeal with MSBCA. On February 27, the purchasing officer formally rejected each aspect of the protest, including the contention that the board was subject to the General Procurement Law. She advised that county school boards were authorized to enter into procurement contracts pursuant to their own procedures, subject to administrative review by the State Board of Education, and

that they were not under the General Procurement Law or subject to the jurisdiction of MSBCA. Unpersuaded, appellants pressed their appeal to MSBCA.

Appellee, joined by the State Board of Education, which intervened as an interested party, moved to dismiss the appeal on the ground that, as appellee was not subject to the General Procurement Law, MSBCA had no jurisdiction to consider the protest and that any administrative review of appellee's decision must come from the State Board of Education. On April 10, 1998, MSBCA filed a memorandum opinion in which it adopted that view and dismissed the appeal. MSBCA concluded that, although county boards of education may be State agencies for some purposes, they are not units in the Executive Branch of the State Government for purposes of the General Procurement Law and are therefore not subject to that law. Although acknowledging some gaps in the law, MSBCA determined that procurement by the county boards was provided for in the Education Article of the Code and that some of the provisions in that Article were inconsistent with the General Procurement Law. Noting the extensive supervisory control possessed by the State Board of Education over matters relating to educational policy and the administration of the public school system, MSBCA held that the authority to review procurement practices and decisions of the county school boards was vested in the State Board of Education and not in MSBCA.

The Circuit Court for Anne Arundel County, on appellants' petition for judicial review, affirmed MSBCA's decision, for the reasons cited by MSBCA. It concluded that "the Education Article, and not the General Procurement Law, governs the procurement of school bus transportation contracts, and that MSBCA is, therefore, not the appropriate forum to which disputes of this nature should be brought." Instead, citing the extensive authority vested in the State Board of Education, the court held that that board was "the appropriate forum" for resolving controversies involving a county board, "including a protest to a solicitation for bids." We granted *certiorari* in

appellants' appeal on our own initiative, prior to any proceedings in the Court of Special Appeals, to review that judgment.

## DISCUSSION

The General Procurement Law is codified in the Maryland Code as Division II (titles 11 through 17) of the State Finance and Procurement Article (SFP). Section 11–202 provides, in relevant part, that, unless otherwise expressly provided by law, the General Procurement Law applies to "each expenditure by *a unit* under a procurement contract." (Emphasis added). MSBCA is created by SFP § 15–205 and is vested with jurisdiction to hear and decide, subject to judicial review, all appeals from the final action of "a unit" on a protest relating to the formation of a procurement contract or, except for a contract claim relating to a lease of real property, on a contract claim concerning breach, performance, modification, or termination. *See* § 15–211.

There is no dispute that the award of a contract by a county school board for bus transportation service constitutes an "expenditure" under a "procurement contract." Thus, whether appellee is subject to the General Procurement Law and, as a result, MSBCA has any jurisdiction in this matter, hinges on whether a county school board is "a unit" within the meaning of that law.

The term "unit" is defined in SFP § 11–101(x):

"(1) 'Unit' means an officer or other entity that is in the Executive Branch of the State government and is authorized by law to enter into a procurement contract.

(2) 'Unit' does not include:

(i) a bistate, multistate, bicounty, or multicounty governmental agency; or

(ii) a special tax district, sanitary district, drainage district, soil conservation district, water supply district, or other political subdivision of the State."

Relying on a number of decisions of this Court holding that county school boards are State, rather than county, agencies, appellants assume that those boards are therefore part of the

Executive Branch of the State government. They thus maintain that, as the boards are authorized by law to enter into procurement contracts but are not within any of the exclusions listed in § 11–101(x)(2), they fall within the definition of "unit." Appellants urge as well that inclusion of county school boards under the General Procurement Law is consistent with and supportive of the purposes of that law, as articulated in § 11–201. Nothing in the Education Article dealing with procurement by county school boards, they contend, is sufficiently inconsistent with the General Procurement Law to suggest an intent by the Legislature to exclude those boards from that law or from the jurisdiction of MSBCA. That agency, they insist, is far more competent to resolve procurement disputes than is the State Board of Education.

■■■ The issue raised is purely one of statutory construction. As we have said so often, in construing a statute, our objective is to ascertain and give effect to the intent of the Legislature. *Melgar v. State,* 355 Md. 339, 347, 734 A.2d 712, 716 (1999). If the language of the statute is clear and unambiguous and expresses a meaning consistent with the statute's goals and apparent purpose, our inquiry normally ends with that language. *Id.* If, on the other hand, the language is susceptible to more than one meaning and is therefore ambiguous, we consider "not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment," and, in those circumstances, in seeking to ascertain legislative intent, we consider "the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730, 732 (1986); *Board of License Commissioners for Charles County v. Toye,* 354 Md. 116, 123, 729 A.2d 407, 410 (1999).

County school boards are creatures of the General Assembly. Section 3–103 of the Education Article (ED) creates such a board for each county, with limited authority to control

educational matters that affect the county. *See* ED § 4–101. In 13 counties, the members of the board are elected by the voters of the county (§ 3–114); in Baltimore City, the members of the board, other than a student member, are appointed jointly by the Governor and the Mayor of Baltimore (§ 3–108.1); in the other counties, the members are appointed by the Governor from among the residents of the county (§ 3–108). The county school systems are funded in part by the State and in part by the counties. *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983).[1] Although in terms of their composition, jurisdiction, funding, and focus, they clearly have a local flavor, the county school boards have consistently been regarded as State, rather than county, agencies. *See Bd. of Ed. v. Montgomery County,* 237 Md. 191, 197, 205 A.2d 202, 205 (1964); *McCarthy v. Bd. of Education of A.A. Co.,* 280 Md. 634, 374 A.2d 1135 (1977); *Bd. of Educ. v. P.G. Co. Educators' Ass'n,* 309 Md. 85, 95 n. 3, 522 A.2d 931, 936 (1987); *Montgomery Co. Ed. Ass'n v. Bd. of Educ.,* 311 Md. 303, 317, 534 A.2d 980, 987 (1987); *Board v. Secretary of Personnel,* 317 Md. 34, 44 n. 5, 562 A.2d 700, 705 (1989); *Board v. Town of Riverdale,* 320 Md. 384, 387 n. 3, 578 A.2d 207, 209 (1990); *State v. Board of Education,* 346 Md. 633, 640, 697 A.2d 1334, 1338 (1997).

County school boards are considered generally to be State agencies because (1) the public school system in Maryland is a comprehensive State-wide system, created by the General Assembly in conformance with the mandate in Article VIII, § 1 of the Maryland Constitution to establish throughout the State a thorough and efficient system of free public schools, (2) the county boards were created by the General Assembly as an integral part of that State system, (3) their mission is

---

1. In Fiscal Year 1998, local appropriations accounted for 54% of operating revenues for primary and secondary education. State appropriations accounted for 41.7% and Federal appropriations for 4.3%. *See* COMMISSION ON EDUCATION FINANCE, EQUITY, AND EXCELLENCE, Preliminary Report, January, 2000, at 30. That is consistent with the data presented in *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. at 606, 458 A.2d at 763.

therefore to carry out a State, not a county, function, and (4) they are subject to extensive supervision by the State Board of Education in virtually every aspect of their operations that affects educational policy or the administration of the public schools in the county. Although legally State agencies for those reasons, they are not normally regarded, for structural or budgetary purposes, as units within the Executive Branch of the State government.

This becomes evident when we examine the place of county school boards in the structure and governance of public education in Maryland. In carrying out the mandate of Article VIII, § 1, the Legislature created a deliberate and well-defined balance between State government structures and State-based but predominantly local structures. The State government structure for primary and secondary education is the State Department of Education, created by ED § 2–101 "as a principal department of the State government." The Department consists of (1) the State Board of Education, which is the head of the Department (§ 2–102) and is vested with ultimate supervisory authority for determining educational policy in Maryland and administering the public school system, (2) the State Superintendent of Schools, who is a member of the Governor's Executive Council (§ 2–303(d)) and serves, in essence, as the chief executive officer of the Department, and (3) the other professional, administrative, and clerical employees employed by the Department, who are State government employees for budgetary and personnel purposes. *See* FY 2000 Maryland State Budget, Part II at 283, showing 1,344 authorized positions for the State Department of Education and an appropriation of nearly $67 million to pay those employees.

The authority of the State Board of Education, codified in part in ED § 2–205, has been described as "a visitatorial power of the most comprehensive character," one that is "in its nature, summary and exclusive." *Wiley v. Allegany County School Comm'rs,* 51 Md. 401, 405–06 (1879); *Zantzinger v. Manning,* 123 Md. 169, 178, 90 A. 839, 842 (1914); *Wilson v.*

*Board of Education,* 234 Md. 561, 565, 200 A.2d 67, 69 (1964). It includes (1) determining the primary and secondary educational policies of the State, (2) explaining the true intent and meaning, causing to be carried out, and deciding all controversies and disputes arising under the provisions of the Education Article that are within its jurisdiction,[2] (3) adopting by-laws, having the force of law, for the administration of the public schools, (4) through the State Superintendent of Schools, exercising general control and supervision over the public schools and educational interests of the State, (5) preparing the annual State public school budget, including appropriations for State aid to the counties for current expenses, student transportation, and public school construction, and (6) specifying the information each county board is required to record and the form in which it is to be recorded.

For each county, the Legislature has created a county department of education that, in structure, generally mirrors that of the State Department of Education. The county school board is the head of the county department and is responsible for administering, in the county, the supervening State policy determined by the State Board of Education, in accordance with State Board's directives.[3] *See* ED § 4–108. There is, as well, a county superintendent, who is the executive officer of the county board and, in essence, the chief executive officer of the county department. Finally, there are the teachers, principals, and other professional, administrative, clerical, security, transportation, and maintenance staff hired by the county school board to work in or service the schools in the county. Unlike the situation at the State level, the county superintendent and the employees of the county department of education are appointed and their salaries are set by the county school board upon recommendation of the county su-

---

2. A major part of the Education Article concerns post-secondary education that is not generally within the jurisdiction of the State Board of Education (or the county boards).

3. The governing board for Baltimore City is currently called the New Baltimore City Board of School Commissioners. *See* ED § 3–108.1.

perintendent, § 4–103(a), in accordance with a personnel system established by the county board.

As we indicated, the State currently provides approximately 42% of the current operating revenues of the county boards. Most of those funds are appropriated by the General Assembly to the State Department of Education for pass-through to the county boards, either in conformance with the basic current expense sharing formula set forth in ED § 5–202 or pursuant to other State aid provisions in title 5 of that article.[4] *See* Fiscal Year 2000 Maryland State Budget, Part II, at 283–334. None of the major appropriations for operating expenses are made directly by the General Assembly to the county boards. The county boards prepare and submit their annual budgets to the respective county governments which, subject to certain limitations and requirements, have ultimate approval power over them. *See* ED §§ 5–102 and 5–103; 76 Op. Atty. Gen. 181, 184 (1991). The State Department of Education, the Governor, and the General Assembly are not directly involved in the budget process for the county boards.

What this statutory scheme reveals is that, although the county boards are generally regarded as State agencies because they are part of the State public education system, are subject to extensive supervision and control by the State Board of Education, and exercise a State function, from a budgetary and structural perspective, they are local in character. They are *not* divisions of or units within the State Department of Education. They are subject to the county, not the State, budget process and must justify their budget requests to the county government. Most of their operational funding comes from the county, not the State, government. When these factors are taken into account, it is clear that the

---

4. The major component of State aid to the county school boards for operating expenses is the State share of basic current expense which, in FY 2000, amounted to $1.56 billion. Other significant categories were aid for students with disabilities ($158 million), aid for innovative programs ($42 million), aid for local employee fringe benefits ($404 million), and aid for transportation services ($175.5 million). *See* FY 2000 Maryland State Budget, Part II–311, 313, 316, 321, 334.

general characterization of county boards of education as State agencies does not require a finding that they are entities "in the Executive Branch of the State government" for purposes of SFP § 11–101(x). At the very least, there is an ambiguity as to whether the term "unit," as defined in § 11–101(x), applies to them. That ambiguity requires that we look further, beyond the precise language of § 11–101(x), to determine legislative intent.

Until 1980, there was no centralized State procurement system in Maryland. The Board of Public Works had jurisdiction and control over the expenditure of the proceeds of loans authorized by the General Assembly, over expenditures for the acquisition of land, buildings, equipment, and other capital items (other than roads, bridges, and highways), over leases of land, buildings, and office space, over the acquisition of architectural and engineering services, and over the sale or other disposition of State property. *See* former Maryland Code (1969 Repl.Vol.), Article 78A, §§ 1, 7, 8, and 15, and former Maryland Code (1978 Repl.Vol.), Article 41, §§ 231N through 231EE. The Department of General Services, a principal department in the Executive Branch, exercised control over purchasing by State agencies. Former Maryland Code (1978 Repl.Vol.), Article 41, § 231G required every "using authority," defined as every "department, board, commission, bureau, division, institution and agency of this State" to purchase all materials, supplies, and equipment through or with the approval of the Secretary of that Department.

Notwithstanding this general authority vested in the Board of Public Works and the Department of General Services, except for the school construction program then authorized by ED, §§ 5–301 through 5–306 (1978 Repl.Vol.) (*see* current ED §§ 5–301 through 5–308), neither the Board nor the Department of General Services exercised any authority over the procurement of supplies and services by the county boards of education.[5] Indeed, § 231L of Article 41 specifically declared

---

5. The one area in which the Legislature has expressly subjected county school board procurement to supervision and control by the Board of

that any "agency of the State government" that received more than half of its regular annual operating expenses from a political subdivision of the State was not a "using authority" within the meaning of that law.

There *were* procurement statutes pertaining specifically to county school boards, but they were codified in the Education Article and, except for the provisions relating to the State school construction program, they made no mention of either the Board of Public Works or the Department of General Services. Section 5–110, for example, dealt with expenditures for school construction and improvement and the procurement of supplies and equipment other than textbooks and instructional materials, and provided that, if the cost exceeded $5,000, the county boards of education must advertise for bids and award the contract to the lowest responsible bidder, after giving consideration to certain enumerated factors. Section 4–116 authorized county school boards, on the recommendation of the county superintendent, to employ architects to assist in preparing plans and specifications for constructing and remodeling buildings. Section 7–106 required the county boards, on the recommendation of the county superintendent, to adopt their own procedures for the selection and purchase of textbooks, other instructional materials, stationery, and school supplies. Section 4–205 required contracts made by the county boards to be approved by the county superintendent.

In 1977, the General Assembly, concerned about the piecemeal approach it had hitherto taken with respect to State

---

Public Works is school construction, and that is because, during the last three decades, the State has paid for most of the cost of that construction. *See* ED § 5–301. The Board of Public Works is authorized to adopt regulations and procedures for the school construction program, and both the county governments and all of the educational agencies, including the county school boards, are expressly made subject to those regulations. § 5–301(h). That authority is not pursuant to the General Procurement Law, however, but arises from provisions in the Education Article, and it is not complete. The county school boards still let the contracts in accordance with ED § 5–112. *See* 76 Op. Atty. Gen. 181, 183 (1991).

procurement, created a Purchasing and Procurement Policies Task Force to review and make recommendations regarding State purchasing and procurement laws and regulations. *See* 1977 Md. Laws, Joint Resolution No. 28. The Task Force, after extensive review, prepared and submitted a bill to the 1978 session (1978 Senate Bill 748), but the bill did not pass. One of the unresolved concerns was over "who should be included and who should be exempted from the provisions of this legislation." *See* PURCHASING AND PROCUREMENT POLICIES TASK FORCE WORKING DRAFT NO. 3, Oct. 30.1978, at iv.

After the failure of Senate Bill 748, the Task Force conducted further study and identified and reviewed 383 procurement laws found in 39 different Articles of the Code, among which were those in the Education Article dealing with county school boards. Each of those laws was examined to determine, among other things, whether (1) it was compatible or in conflict with the proposed comprehensive procurement law, (2) it should be transferred to and become a part of the new procurement law, and (3) the agency to which the law pertained should be subject to the new procurement law. In that third regard, the Task Force noted the existence of State agencies "which seem predominantly local in character" and recommended that "most, if not all, of these should probably be excluded from the effect of the [new procurement law]." PURCHASING AND PROCUREMENT POLICIES TASK FORCE, Subcommittee to Review Current State Procurement Laws, *Report of Recommendations,* December, 1978, at 11.

Legislation implementing the Task Force's recommendations was enacted in 1980, to become effective in 1981. *See* 1980 Md. Laws, ch. 775. It placed full control over the procurement of "all supplies, services, construction, and other items procured by the State" in the Board of Public Works, which was directed to adopt regulations "governing procedures for the review and approval of procurement contracts." Former Maryland Code (1973 Repl.Vol. and 1979 Supp.) Article 21, § 2–101. The law allowed the Board to delegate some of its authority to certain control agencies—the Departments of General Services, Budget and Fiscal Planning, and Trans-

portation, and the University of Maryland. The new procurement law was made applicable to "every expenditure by a State agency for supplies, services, and construction under any contract or similar business agreement." *Id.,* Article 21, § 1–202(a)(1). "State agency," in turn, was defined in § 1–101(p) as "any agency, association, board, bureau, college, commission, committee, council, foundation, fund, department, institute, institution, public corporation, service, trust, university, or other unit of the executive branch of the State government and includes any subunit within any of these units."

The current version of the General Procurement Law was enacted in 1988 as part of the ongoing Code Revision process that produced SFP. It was in that enactment that the term "unit" was substituted for the former terms "State agency" and "procurement agency," with no substantive change intended. *See* Revisor's Note to SFP § 11–101(v) (1988 Vol.).

Both the history of the 1980 law and the experience under it reveal a number of things relevant to the issue before us. The Legislature was aware that procurement of supplies and services by county school boards was governed by provisions in the Education Article and that such procurement had never been subject to control by the Board of Public Works or the Department of General Services. It was aware, by contrast, that school construction projects *were* subject to some Board of Public Works control, mostly in terms of which projects and costs the State would fund. The Legislature had before it the basic policy issue of whether to include under the new procurement law procurement by agencies that had not previously been subject to Board of Public Works and Department of General Services jurisdiction, including agencies that were considered to be State agencies but that were predominantly local in character. Some agencies, or types of procurement, it chose to include; others it chose to exclude. *See* SFP, §§ 11–101(x)(2) and 11–203. In Section 24 of the 1980 enactment, the Legislature declared that all laws that were inconsistent with the new procurement law were superseded to the extent of the inconsistency.

In making these choices, the General Assembly left intact, without change, the procurement provisions in the Education Article. That alone indicates an intent to allow the county school boards to continue to operate under those provisions and not subject them to an entirely new regime of substantive and procedural requirements. Of at least equal significance is the fact that most of those provisions have since been amended, demonstrating clearly a legislative recognition that they were *not* superseded by the 1980 law.[6]

In the 19 years since the General Procurement Law went into effect, no effort has been made to subject the procurement of supplies and services by county school boards to that law. To the best of our knowledge, with the limited exception noted for school construction, none of the State control agencies—neither the Board of Public Works nor the Departments of Budget and Management or General Services—have ever attempted to exercise jurisdiction over procurement contracts entered into by the county school boards. Throughout that period, those contracts have been regarded as local matters, subject to supervision on the State level by the State Board of Education. The State Board of Education has, indeed, entertained appeals from non-school construction procurement decisions made by the county school boards, including decisions regarding school bus contracts. *See, for example, Clyde's Bus Service v. Anne Arundel County Board of Education,* 3 Opinions of MSBE 621 (1984) (affirming cancellation of school bus contract because contractor was disqualified, due to vision deficiency, from driving school bus); *Holloway Transit, Inc. v. Wicomico County Board of Education,* 5 Opinions of MSBE

---

6. Since 1980, ED § 5–112 (former § 5–110), dealing with certain capital expenditures and the purchase of supplies and equipment, has been amended 13 times; § 7–106, dealing with the purchase of textbooks and instructional materials, and § 4–117 (former § 4–116), authorizing the county school boards to employ architects, have been amended twice; § 4–205 requiring approval by the county superintendent of all contracts, has been amended five times; minority business enterprise laws applicable to procurement by the Montgomery County, Prince George's County, and Baltimore City school boards were enacted. *See* ED §§ 4–125, 4–310, and 5–112(d).

431 (1989) (affirming decision of county school board to limit the number of school bus contracts awardable to single contractor); *Bickling v. Caroline County Board of Education,* 6 Opinions of MSBE 80 (1991) (affirming decision of county school board to award school bus contract to a different contractor). *Compare S.B. Construction Company, Inc. v. Montgomery County Board of Education,* 3 Opinions of MSBE 595 (1984), in which the State Board of Education concluded that a contractor was not required to present a school construction procurement dispute, which involved primarily legal issues, to the Board before proceeding to court. The Board carefully noted its limited jurisdiction in that area, agreeing to review those matters dealing "with the proper administration of the school system" but declining to rule on whether the county board's actions "were contrary to any procurement regulations or requirements of the Maryland State Interagency Committee for School Construction (IAC), which is subject to the Maryland State Board of Public Works, and not this agency." *Id.* at 600.

■ We find no basis, upon this analysis, to conclude that the Legislature ever intended to subject procurement by a county school board to the General Procurement Law. It is inconceivable that the General Assembly would have made such a dramatic shift in policy without some clearer indication of its intent to do so.[7] We hold, therefore, that a county school board is not a "unit" within the meaning of that law, and, accordingly, that MSBCA has no jurisdiction over dis-

---

**7.** The effects of subjecting county school board procurement to the General Procurement Law are not inconsequential. Major changes in contract terms and procedure would be required; new duties would be cast upon the Board of Public Works and the Departments of General Services and Budget and Management; and new and expanded jurisdiction would be vested in MSBCA. Apart from these administrative or logistical consequences, subjection of county school board procurement to the General Procurement Law might well put the Board of Public Works, the Department of Budget and Management, and MSBCA in the middle of disputes over textbook and instructional material selection, which the Legislature could not possibly have intended.

putes arising from procurement decisions made by those boards.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.