53 A.3d 347

**BUILDING MATERIALS CORPORATION OF AMERICA**
**d/b/a GAF Materials Corporation**

v.

**BOARD OF EDUCATION OF BALTIMORE COUNTY.**

**No. 71, Sept. Term, 2011.**

Court of Appeals of Maryland.

Sept. 24, 2012.

David L. Cole, Jr. (Eric Radz of Ober, Kaler, Grimes & Shriver, Baltimore, MD), on brief, for appellant.

Edmund J. O'Meally (David A. Burkhouse and Andrew G. Scott of Hodes, Pessin & Katz, P.A., Towson, MD; Margaret-Ann F. Howie, General Counsel, Baltimore County Public Schools, Towson, MD), on brief, for appellee.

John M.G. Murphy, Esq., The Law Office of John M.G. Murphy, LLC, Baltimore, MD, for amicus curiae brief Coalition for Procurement Reform and for amicus curiae brief Carlisle Construction Materials Incorporated.

Sharon Oras Morgan, Esq., Fox Rothschild LLP, Wilmington, DE, for amicus curiae brief Central Susquehanna Intermediate Unit.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

McDONALD, J.

The point of contention in this case is whether a local board of education has acted within its statutory authority. For some years, the Board of Education of Baltimore County ("Board of Education"), the Appellee, has belonged to a governmental group purchasing consortium—a sort of warehouse club for government entities—which competitively bid a roofing services contract on behalf of its members. The Board of Education has relied on that contract to fulfill its needs for roofing repair services. Appellant Building Materials Corporation of America, a nationwide manufacturer of roofing materials that does business under the name GAF Materials Corporation ("GAF"), questions the Board of Education's authority for that practice under the pertinent statutes.

A local board of education derives its powers and responsibilities from the State education law. One section of that law

requires a local school system to conduct a competitive bidding process itself for procurement but explicitly authorizes the use of intergovernmental purchasing cooperatives for the purchase of "goods and commodities"—a phrase that ordinarily would not be understood to encompass construction services. In other parts of the education law, however, the Legislature has delegated substantial authority to the Board of Public Works and the Interagency Committee on School Construction to direct and oversee local school construction financed with State funds. Those agencies have endorsed the use of intergovernmental cooperatives in regulation and have specifically approved its use by the Board of Education for the acquisition of roofing services.

The Circuit Court for Baltimore County granted summary judgment in favor of the Board of Education. We affirm that judgment. When viewed in the context of the entire education law and regulations promulgated under that law, the competitive bidding statute does not bar the Board of Education from using its membership in an intergovernmental purchasing consortium for the procurement of roofing repair services.

## Background

### *Public School Governance and Funding*

In compliance with the constitutional directive to establish a "thorough and efficient" system of public education,[1] the General Assembly has created a structure for the operation and maintenance of public schools that weaves together State and local responsibilities. Local boards of education, such as the Appellee in this case, operate school systems in each county, subject to oversight by the State Board of Education. Maryland Code, Education Article ("ED"), §§ 2–205, 4–101. Despite their local focus, county boards of education are State agencies that are funded in part by the State and in part by their respective counties. *Chesapeake Charter, Inc. v. Anne Arundel County Board of Education*, 358 Md. 129, 136, 747 A.2d 625 (2000); ED § 5–202

---

1. Maryland Constitution, Article VIII, § 1.

("foundation program" for financing local public schools with a combination of State, local, and federal funds). Similarly, while public school construction is very much a local affair, it is subsidized and supervised to a significant degree by the State. ED § 5–301 *et seq.*

## Procurement by Local School Boards

*General Requirement for Competitive Bidding—ED § 5–112*

■ While local school boards are formally State agencies and receive a substantial proportion of their funding from the State, they are not subject to the State's general procurement law. *Chesapeake Charter, supra.* Other State statutes, however, control procurement by a local board. Under ED § 5–112, a local board must ordinarily follow competitive bidding procedures when procuring buildings, improvements, supplies, or equipment costing more than $25,000.[2] The statute has an exception to that requirement for "contracts for *goods or commodities* that are awarded by ... intergovernmental purchasing organizations if the lead agency for the contract follows public bidding procedures." ED § 5–112(a)(3) (emphasis added).

### Oversight of School Construction by Board of Public Works

■ In regards to the construction of a particular type of building[3]—a school—the State Board of Public Works ("BPW")[4] has a preeminent role. The BPW determines

---

**2.** Bids must conform to specifications regarding quantities involved, the time required for delivery, the purpose, the competency and responsibility of the bidder, the ability of the bidder to perform satisfactory service, and the bidder's plan to use minority contractors. ED § 5–112(c)(1).

**3.** Local boards may construct other types of buildings without the same oversight by the BPW. *See* COMAR 23.03.05.01B (excluding construction of office buildings, warehouses, vehicle maintenance buildings, and similar structures from purview of regulations).

**4.** A creature of the State Constitution, the BPW consists of the Governor, the Comptroller, and the State Treasurer. Maryland Constitution,

which school construction projects receive State funding. ED § 5–301(c); COMAR 23.03.02.03F. If a project receives State funding, it is subject to supervision and control by the BPW. *Beka Industries, Inc. v. Board of Education,* 419 Md. 194, 205, 18 A.3d 890 (2011); *Chesapeake Charter,* 358 Md. at 140 n. 5, 747 A.2d 625. In particular, the Legislature has directed the BPW to "adopt regulations for the administration of programs [of public school construction and capital improvements]" subsidized by State funds. ED § 5–301(d)(1). Pertinent to this controversy, those regulations:

> ... may contain requirements for:
>
> . . .
>
> (iv) The approval of sites, plans, and specifications for the construction of new school buildings or the improvement of existing buildings;
>
> . . .
>
> (vi) Competitive bidding;
>
> . . .
>
> (viii) The actual construction of school buildings or their improvements;
>
> (ix) The relative roles of different State and local governmental agencies in the planning and construction of school buildings or capital improvements;
>
> (x) School construction and capital improvements necessary or appropriate for the proper implementation of this section;
>
> . . .
>
> (xi) The award of contracts by school systems; ...

ED § 5–301(d)(2); *see also* ED § 5–301(b) (BPW to adopt regulations on eligible and ineligible costs); § 5–301(b–1) (BPW to adopt regulations on indoor air quality for classrooms); § 4–126(c), (g) (BPW to adopt regulations governing

---

Article XII, § 1. While the powers and duties specifically assigned to the BPW in the Constitution are now largely obsolete, it continues to perform important powers conferred by the Legislature in State law that largely relate to State finance and procurement. *See* 76 *Opinions of the Attorney General* 46, 49 & n. 3 (1991).

alternative financing arrangements for school construction). In adopting regulations, the BPW is to provide for the "maximum exercise of initiative" by county school systems to ensure that school construction meets the needs of the community and is a prudent expenditure of State funds. ED § 5–301(d)(4).

County school boards are subject to the school construction regulations adopted by the BPW. ED § 5–301(g)(1). The Legislature has directed that, in the event of a conflict between those regulations and the "authority, responsibilities, powers and duties" of a county school board (or those of certain other State and local agencies), the BPW's regulations prevail. ED § 5–301(g)(2).[5] Moreover, the Legislature has expressly made State funding of local school construction contingent on compliance with the BPW's regulations. ED § 5–301(h).

*Interagency Committee on School Construction*

To assist the BPW in its duties related to school construction and to administer the State's public school construction program on behalf of the BPW, the Legislature has created the Interagency Committee on School Construction ("IAC").[6]

---

**5.** The statute provides, in pertinent part:

(1) With respect to public school construction or public school capital improvements, . . . the authority, responsibilities, powers, and duties of the following are subject to the regulations adopted by the Board of Public Works under this section:

(i) The State Board;

(ii) The State Superintendent;

(iii) The county governments;

(iv) *The county boards;* and

(v) All other State and local governmental agencies under this article.

(2) If, as to public school construction or public school capital improvements, there is any conflict between the regulations and procedures of the Board of Public Works and the authority, responsibilities, powers, and duties of the individuals and agencies specified in paragraph (1) of this subsection, *the regulations and procedures of the Board of Public Works shall prevail.*

ED § 5–301(g) (emphasis added).

**6.** The IAC has five members: the State Superintendent of Schools, the Secretary of Planning, the Secretary of General Services, and two

ED § 5–302. The BPW is authorized to delegate its administrative and budget authority with respect to school construction to the IAC as "necessary and appropriate." ED § 5–302(a)(5). The Legislature has also specifically directed the BPW to adopt regulations as recommended by the IAC. *See* ED § 4–126(g) (regulations concerning alternative financing arrangements); ED § 5–301 (regulations concerning planning and procurement of school construction).

*Regulations Authorizing "Intergovernmental Cooperative Purchasing"*

Participation in intergovernmental cooperative purchasing arrangements, if done well, can yield savings in time and funds devoted to administering a procurement process, as well as result in a more favorable price. *See* National Association of State Purchasing Officers, *Strength in Numbers: An Introduction to Cooperative Procurements,* available at <*www.naspo.org/documents/Cooperative_Purchasing0410 update.pdf*>. In its school construction regulations, the BPW has endorsed the use of intergovernmental cooperative purchasing agreements as an alternative to competitive bidding procedures in certain circumstances. COMAR 23.03.03.03; COMAR 23.03.03.04; COMAR 23.03.03.12. In particular, the regulation concerning procurement methods provides:

Methods of Source Selection. Unless otherwise authorized, school construction procurement contracts shall be awarded by one of the following methods:

A.  Competitive sealed bidding, including competitive multistep sealed bidding;

B.  Quality-based selection;

C.  Competitive negotiation;

D.  Unsolicited proposals;

E.  *Intergovernmental cooperative purchasing;*

---

individuals appointed by the President of the Senate and the Speaker of the House, respectively. ED § 5–302(a)(2). The IAC is considered to be a unit within the State Department of Education for budget and administrative purposes. ED § 5–302(a)(1).

F.   Sole source;  or

G.   Negotiated award after unsatisfactory competitive bidding.

COMAR 23.03.03.03 (emphasis added).  The regulations further state a preference for the use of the competitive sealed bidding method, but permit the use of other methods under specified circumstances.   COMAR 23.03.03.04.[7]   One of the regulations sets forth the circumstances under which a school system may use intergovernmental cooperative purchasing:

Intergovernmental Cooperative Purchasing.

A.   General. Intergovernmental cooperative purchasing means a method of source selection that permits [a county board of education] to aggregate with other government entities their common requirements for purposes of maximizing economies of scale when soliciting bids or proposals for goods and commodities or to purchase its requirements from another governmental entity's contract if that contract is an intergovernmental purchasing agreement.

B.   [A county board of education] may use the intergovernmental cooperative purchasing method if it determines that the method:

(1) Will provide cost benefits, promote administrative efficiencies, or promote governmental cooperation;  and

(2) Is not intended to avoid competition.

C.   Types. [A county board of education] may use the following types of intergovernmental cooperative purchasing method:

(1) Pooling, a method that includes the following steps:

---

**7.**   At the time this litigation commenced, COMAR 23.03.03.04, which authorizes a county board of education to use various procurement methods as alternatives to competitive sealed bidding, included a cross-reference to the regulation that sets forth permissible uses of intergovernmental cooperative purchasing, but erroneously cited it as COMAR 23.03.03.*11B* rather than COMAR 23.03.03.*12B*. That error has apparently since been corrected.   38:23 Md. R. 1423 (November 14, 2011).

(a) Each participating governmental entity agrees to procure its respective requirements from the successful bidder or offeror;

(b) A lead jurisdiction conducts the procurement on behalf of all participants; and

(c) Either a master contract award or awards is made by the lead jurisdiction on behalf of all participants or each participant awards its own contract; and

(2) Piggybacking, a method wherein [a county board of education] purchases its requirements from another governmental entity's contract if that contract contains an intergovernmental cooperative purchasing clause.

COMAR 23.03.03.12.

### Board of Education Roofing Contracts

In 2005, the Board of Education joined the Pennsylvania Education Joint Purchasing Council ("PAEJPC"), an intergovernmental purchasing cooperative that serves more than 300 school systems, colleges, and universities in Pennsylvania, Maryland, and West Virginia. *See* <*www.paejpc.org* > (last visited August 9, 2012). PAEJPC offers its members the opportunity to participate in various cooperative purchasing contracts, including a contract for roofing services, that have been developed through a competitive bidding process conducted by the Association of Educational Purchasing Agencies ("AEPA"), another government agency consortium.[8] The Board of Education sought and obtained permission from the IAC to purchase roofing services through PAEJPC and AEPA.

---

8. AEPA is a national intergovernmental purchasing cooperative that undertakes a competitive bid process for contracts for various services on behalf of agencies in 22 states. *See* <*www.aepacoop.org*/pages/Association_of_Educational_Pur> (last visited August 28, 2012). With respect to roofing services, it has conducted an advertised bid process on a four-year cycle. PAEJPC is a member of AEPA.

In recent years, the successful bidder for the AEPA roofing services contracts has been Weatherproofing Technologies, Inc. ("TREMCO"), a competitor of GAF.[9] Since January 2006, the Board of Education, through its membership in the cooperative, has directly awarded TREMCO at least 46 contracts, valued at more than $64 million, for roofing services. Each contract was reviewed and approved by the IAC and funded by the State with the approval of the BPW.

### GAF Complaint

This case began when GAF filed a declaratory judgment action in January 2009 against the Board of Education in the Circuit Court for Baltimore County.[10] In that action, GAF sought a declaration that the Board of Education's procurement of roofing services failed to comply with the State laws governing local boards of education. GAF alleged that the Board of Education's participation in the AEPA roofing services contract prevented roofers who would use GAF's materials from bidding on the Board's projects.[11]

The parties filed cross motions for summary judgment. They agreed that there were no material facts in dispute and that the issue to be resolved was a question of law. Following a hearing on the motions, the Circuit Court ruled in favor of the Board of Education in January 2011. GAF noted a timely appeal. It later filed a petition for writ of certiorari, which this Court granted before the matter was heard by the Court of Special Appeals.

---

**9.** It appears that GAF may have competed for the purchasing cooperative contract in 2000, but did not do so in 2004 and 2008.

**10.** GAF first filed suit in 2008 in the United States District Court for the District of Maryland, seeking a declaratory judgment that the Board of Education's procurement of roofing services violated State law. That action was dismissed without prejudice on jurisdictional grounds. Shortly thereafter, GAF filed its complaint in this case, seeking similar relief.

**11.** GAF's roofing materials are installed by independent contractors. GAF itself provides some roofing services, such as specification and design review and inspection services.

### Discussion

■ As is evident, there is no dispute as to the underlying facts and, indeed, this case does not concern any particular procurement.[12] Accordingly, our decision turns entirely on how the relevant statutes should be construed—a matter on which we owe no special deference to a circuit court. *See, e.g., Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879 (2004).

GAF asserts that the Board of Education, in awarding contracts to TREMCO through the purchasing cooperative, failed to comply with ED § 5–112 by not developing specifications, advertising for bids, and competitively awarding contracts itself. GAF further argues that the exception in ED § 5–112(a)(3) for purchases of "goods and commodities" through purchasing cooperatives does not apply because roofing services are not a "good" or "commodity." It contends that installation of a roof is an "improvement" for which the Board of Education should conduct its own competitive bidding process under ED § 5–112(b). In support of this argument, GAF cites the general State procurement regulations that define "improvement" as "the construction, maintenance, and repair of any building, structure, or other public work now or hereafter constructed or acquired by the State or any State agency." COMAR 21.01.02.01(B)(69).[13] Roof repair and replacement, it notes, are "construction, maintenance, and repair" of a building or structure.

---

12. GAF seeks declaratory and injunctive relief directed to future procurements by the Board of Education. We are not called upon to examine the circumstances of specific past procurements.

13. The reference to the regulations adopted under the State procurement law presumably is by way of analogy as the State procurement law and regulations do not generally apply to county boards of education. *See Chesapeake Charter, Inc. v. Anne Arundel County Board of Education,* 358 Md. 129, 140 n. 5, 747 A.2d 625 (2000). In 2009, the General Assembly did extend a provision of the State procurement law to county boards of education—a provision that encourages and authorizes participation in cooperative purchasing agreements. Maryland Code, State Finance & Procurement Article, § 13–110; *see* note 21 below.

The Board of Education disputes GAF"s reading of ED § 5–112(a)(3), arguing that roofing repair services could qualify as "goods or commodities." It also points to the authority of the BPW and the IAC over school construction and the green light those agencies have given to its procurement of roofing services through the cooperative.

### Plain Meaning in Context

Much has been made of the "plain meaning rule" in the briefs filed by the parties. To be sure, plain meaning is a stalwart first step in our approach to statutory construction.[14] A preliminary matter, however, is to identify the statutory or regulatory language to be construed. Consider the well-known phrase "She loves me; she loves me not." If one focuses only on the first clause, the plain meaning appears clear—no need for further exploration. Similarly, if one considers only the second clause, the meaning seems equally clear though quite different. But when the sentence is considered as a whole, there is ambiguity and one must know more than the language alone to discern its meaning. Context and history matter. As this Court has said, "[t]he meaning of the plainest language is controlled by the context in which it appears."[15]

This Court has previously said that the competitive bidding provision of ED § 5–112 must be viewed in context. In *Demory Bros., Inc. v. Board of Public Works,* 273 Md. 320, 329 A.2d 674 (1974), a potential contractor opposed the award of a school construction contract on the basis that the competitive bidding statute[16] precluded application of the prevailing

---

**14.** *See Davis v. State,* 426 Md. 211, 218, 43 A.3d 1044 (2012), and innumerable prior cases.

**15.** *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514, 525 A.2d 628 (1987).

**16.** At the time of the *Demory* decision, the competitive bidding statute for local school boards was codified at Maryland Code, Article 77, § 123. It was later recodified as ED § 5–110 upon the creation of the Education Article as part of code revision (Chapter 22, Laws of Mary-

wage law to the procurement as the bidder who promised compliance with the prevailing wage statute had submitted a higher bid than the bidder who did not. This Court rejected that argument, reasoning that the competitive bidding statute could not be considered in isolation from other statutory provisions relating to school construction. 273 Md. at 327–29, 329 A.2d 674. The Court also held that great weight should be accorded to the BPW's and IAC's interpretation of the public school construction statutes. *Id.* at 327, 329 A.2d 674. To assess GAF's argument in this case, we must also consider ED § 5–112 in light of those agencies' implementation of the school construction laws.

### Legislative History

To place the competitive bidding statute for local board procurement in context, we take a brief detour into the history of the statutes relating to construction of local public schools. That review reveals that the key statutes are the product of three waves of legislative concern that occurred at 30–year intervals.

*1930s—Requirement of Locally–Conducted Competitive Bidding*

The Legislature first created a competitive bidding requirement for local school construction in 1933 when it enacted the predecessor of ED § 5–112. Chapter 151, § 59B, Laws of Maryland 1933, *then codified at* Article 77, § 59B.[17] It had the usual purposes of preventing favoritism and procuring construction at the lowest cost to the taxpayers. *Board of Education v. Allender,* 206 Md. 466, 475, 112 A.2d 455 (1955). At that time, school construction was largely a county concern.

---

land 1978) and later renumbered as ED § 5–112 (Chapter 10, § 16, Laws of Maryland 1996).

**17.** The use of competitive bidding to award government contracts to the lowest qualified responsible bidder is a time-honored method of government procurement. *See* J. Nagle, *History of Government Contracting* (2d ed.1999) at pp. 7, 46–60 (describing use of competitive bidding by Robert Morris to supply the Continental Army during the Revolutionary War).

It was only during the post-World War II boom in school construction that the State first became involved in financing and overseeing public school construction. A. Wilner, The Maryland Board of Public Works: A History (1984) at 95, 103. At that time the Legislature authorized the sale of State bonds to assist the counties with school construction, but required that the financial assistance be contingent on the approval of the BPW. *Id.* In essence, the State lent its credit to local school systems to help finance local school construction and the BPW simply allocated the use of the State's credit among the various jurisdictions. The BPW was not further involved in the details of procurement or construction.

*1970s—BPW Authority to Regulate Local School Construction*

This changed in the early 1970s. "In 1971 the State undertook a considerably expanded role in financing local school construction, and the [BPW] was assigned a much more active role in administering the program." Wilner, *supra*, at 104. The Legislature created the Public School Construction Program and gave the BPW significant responsibility, enacting the predecessors of the statutes now codified at ED § 5–301 *et seq.* Chapter 624, Laws of Maryland 1971. The BPW was authorized to adopt "rules, regulations, and procedures" on a broad range of activities related to school construction.[18] Un-

---

**18.** The Legislature authorized the BPW to prescribe requirements for:

... the development and submission of long-range plans, the submission of annual plans and/or plans for specific projects, the submission of other data or information relevant to school construction or capital improvements, the approval of sites, plans and specifications for the construction of new school buildings or the improvement of existing buildings, site improvements, competitive bidding, the hiring of personnel in connection with school construction or capital improvement, the actual construction of school buildings or improvements thereto, the relative roles of different State and local governmental agencies in the planning and construction of school buildings or school capital improvements, and any other requirements involving school construction and capital improvements necessary or appropriate....

Chapter 624, Laws of Maryland 1971, *then codified at* Maryland Code, Article 77, § 130A.

der that authority the BPW made the controversial decision to create the IAC by regulation [19]—a decision later affirmed by the General Assembly in statute. The 1971 legislation also made the "authority, responsibilities, powers, and duties" of all State and local officials involved in school construction subject to the BPW's rules and regulations. This trump card of the BPW currently appears at ED § 5–301(g)(1).

*2000s—Extension of BPW Authority to Include Procurement and Financing Methods*

Approximately 30 years later, the General Assembly authorized greater reliance on procurement methods other than locally-conducted competitive bidding. In particular, in several instances it endorsed the use of collaborative purchasing methods as an alternative to competitive bidding. It also delegated additional authority to the BPW and IAC with respect to local school construction. And it commissioned a comprehensive review of public school construction in Maryland.

In 2002, the Legislature qualified the competitive bidding requirement in ED § 5–112. It amended that statute to specifically allow local boards of education to participate in intergovernmental purchasing organizations to purchase goods and commodities. Chapters 170, 171, Laws of Maryland 2002, *codified at* ED 5–112(a)(3).[20] The rationale for the amendment was that cooperative purchasing arrangements were likely to result in significant cost savings by reducing advertising and administrative costs and by allowing school systems to take advantage of volume discounts.[21]

---

**19.** *See* Wilner, *supra,* at 105.

**20.** An earlier attempt to create a narrower authorization for a group purchasing consortium for textbooks and educational supplies had failed. *See* Senate Bill 382 (2001); House Bill 251 (2001).

**21.** This was an extension of a State policy, previously adopted in the general procurement law, to take advantage of government purchasing cooperatives. In 1997, the General Assembly amended the State procurement law to authorize State agencies to participate in intergovernmental cooperative purchasing agreements as an alternative to competi-

Also in 2002, the Legislature created the Task Force to Study Public School Facilities ("Task Force"). Chapter 288, § 5, Laws of Maryland 2002.[22] The Task Force conducted a survey that found that the estimated cost of bringing public schools up to current standards would be approximately $4 billion, of which $1.3 billion represented the cost of repairs and replacement of existing building systems. Final Report of Task Force to Study Public School Facilities (February 2004) at pp. 2–3.

Several of the Task Force's recommendations are relevant to the issue before us. The Task Force noted that many policy decisions had been delegated to the BPW and IAC; it recommended that those policy decisions be expressed in regulations subject to the State Administrative Procedure Act. Task Force Report at pp. 43–46. The Task Force also recommended that local school systems be afforded the flexibility to use alternative financing methods for school construction and "to develop the procurement, contractual, and technical instruments that will meet State and local procurement requirements and bring the project to a successful conclusion." *Id.* at 41. It also encouraged pooling by school systems in certain types of contracts, recommending that the State "distribute information on existing State purchasing contracts for school

tive sealed bidding. Chapter 680, Laws of Maryland 1997, *codified at* Maryland Code, State Finance & Procurement Article ("SFP"), § 13–110. The Legislature eventually amended that statute to explicitly include local boards of education that receive State funding in that authorization. Chapter 677, Laws of Maryland 2009; *see* SFP § 13–110(a)(5)(ii).

22. The General Assembly had previously created the Commission on Education Finance, Equity, and Excellence, popularly known as the Thornton Commission, to study ways to improve the financing and performance of public schools in Maryland. Chapter 601, Laws of Maryland 1999. The Thornton Commission in turn recommended the creation of the Task Force to focus specifically issues related to school construction. Final Report of Commission on Education Finance, Equity, and Excellence (January 2002) at pp. 81–82. The Legislature responded by creating the Task Force in the Bridge to Excellence in Public Schools Act of 2002, Chapter 288, Laws of Maryland 2002, which incorporated various recommendations of the Thornton Commission.

furniture, equipment, and services that may be shared by local school systems." *Id.* at 58.[23]

The Legislature responded to the Task Force Report by adopting the Public School Facilities Act of 2004. Chapters 306, 307, Laws of Maryland 2004. That legislation authorized local school systems, in a new ED § 4–126, to use "alternative financing methods" for public school construction in accordance with regulations adopted by the BPW, to use alternative methods of project delivery (*e.g.*, construction manager at risk), and to procure school construction by methods other than competitive bidding (*e.g.*, competitive negotiation, acceptance of unsolicited proposals, quality-based selection).[24] The Legislature delegated to the BPW the task of defining the circumstances and guidelines for local school systems to exercise their new powers. ED § 4–126(g).

In the same legislation, the General Assembly also expanded the BPW's authority under ED § 5–301 to adopt regulations governing school construction generally to include, among other things, "the award of contracts by school systems." *Id.*, § 2. The BPW exercised its expanded authority to adopt the regulations quoted earlier that authorize local school systems to use intergovernmental cooperative purchasing, including piggybacking and pooling arrangements. COMAR 23.03.03.03; COMAR 23.03.03.12.

*Summary*

As the above history demonstrates, the competitive bidding requirement of ED § 5–112 is longstanding and predates the

---

**23.** In the 2004 legislation based on the Task Force recommendations, the Legislature subsequently directed the State Department of General Services to provide an annual report to local school systems on existing State contracts open to participation by school systems. *See* ED § 5–311.

**24.** GAF argues that ED § 4–126 should be construed narrowly, in light of the title given to it—"Alternative financing methods." The title and tag lines in the statute were supplied by the legal publisher rather than the Legislature and accordingly have little bearing on legislative intent. *See* Maryland Code, Article I, § 18; *Morris v. Prince George's County*, 319 Md. 597, 607 n. 4, 573 A.2d 1346 (1990).

significant involvement of the State in subsidizing the construction of local schools. As the State role in financing of public education subsequently increased, the General Assembly has modified the general preference for sealed competitive bidding, particularly in the area of school construction, and delegated substantial authority to the BPW to oversee the financing, procurement, and construction of schools.

These legislative directives to the BPW leave no doubt that the regulations adopted by the BPW are to be treated as "substantive" or "legislative" regulations that are binding on the courts and have the "force of law." *Sec'y Dep't of Pub. Safety & Corr. Servs. v. Demby,* 390 Md. 580, 604–5, 890 A.2d 310, 325 (2006) (citing *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n,* 874 F.2d 205, 207–08 (4th Cir.1989)).[25] And the General Assembly has given the BPW the ability to exercise control over all other agencies in the area of public school construction. ED § 5–301(g).

### Whether the Board of Education May Use the Cooperative to Purchase Roofing Services

As indicated above, ED § 5–112—which applies generally to local board procurements—allows local boards to use contracts awarded by intergovernmental purchasing organizations for the procurement of "goods" or "commodities"—terms that are not defined in the education law. Roofing repair services would appear to be outside those terms under the

---

**25.** Legislative regulations result from a specific statutory grant, and are treated and enforced as binding law. This is in contrast to "interpretive" regulations, which do not arise from an explicit legislative mandate and are not afforded similar deference. "Interpretative rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties. In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties." *Demby, supra,* 390 Md. at 604–05, 890 A.2d 310. In Maryland, all regulations, whether legislative or interpretive, are adopted under the State Administrative Procedure Act. *See Engineering Management Services v. State Highway Administration,* 375 Md. 211, 232–33, 825 A.2d 966, 978 (2003); 75 *Opinions of the Attorney General* 37, 43–50 (1990).

definitions that GAF marshals from a variety of sources.[26] To argue to the contrary, the Board of Education relies on the opinion of the executive director of the IAC that the terms "goods" and "commodities" were meant to encompass roof repair.[27] But little weight is to be accorded to post-enactment statements of legislative intent, even by the legislators who passed the particular law. *See Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 471 n. 18, 530 A.2d 245 (1987); Sutherland, Statutory Construction § 48.20 (7th ed.2007). Thus, there appears to be little basis for concluding that ED § 5–112(a)(3) authorizes the use of such contracts for roof repair.

The meaning of "good" and "commodity" in ED § 5–112 may seem plain enough even without the aid of a statutory definition, but those two terms are not all we must consider. As noted above, other enactments of the General Assembly which, unlike ED § 5–112,[28] are specific to school construction and finance, direct the BPW to adopt legislative regulations concerning the award of school construction contracts by local school systems—regulations that are to provide for the "maximum exercise of initiative" by those systems and that override the "authority, responsibilities, powers and duties" that otherwise govern a local school system. ED § 5–301. In a similar vein, the Legislature has authorized local school boards to use "alternative" financing and project delivery methods—subject

---

**26.** GAF cites definitions of those terms found in the Maryland Uniform Commercial Code (Maryland Code, Commercial Law Article, § 2–105), Black's Law Dictionary, the American Heritage New Dictionary of Cultural Literacy, the on-line Cambridge Dictionaries, and Dictionary.com.

**27.** In a textbook example of the art of advocacy in a deposition, GAF's counsel required only a few questions to obtain the concession from the executive director that, under this theory, the construction of an entire school would fall within the definition of a "good" or "commodity."

**28.** The Legislature codified ED § 5–112 in subtitle 1 of Title 5 of the Education Article—a subtitle that deals generally with the budgets and financing of local school systems. ED § 5–301 is part of subtitle 3, which concerns specifically school construction; ED § 4–126 appears in a subtitle that treats the powers of local boards of education.

to BPW regulation—and contemplates that those methods of building schools might not involve the normal competitive bidding process. ED § 4–126.

Under its statutory authority, and on the recommendation of the IAC, the BPW has adopted regulations that permit local systems to draw upon intergovernmental cooperative purchasing agreements for various needs. The key regulation authorizes the use of intergovernmental cooperative purchasing not only to buy goods and commodities but also to purchase "requirements" under an intergovernmental purchasing agreement of another governmental entity. COMAR 23.03.03.12A. Under the regulation, a local school system may use such an intergovernmental purchasing agreement if it is not attempting to avoid competition and if it perceives benefits, in terms of cost, efficiency, or governmental cooperation, from that use. COMAR 23.03.03.12B. The regulation identifies two common types of intergovernmental purchasing arrangements—pooling and piggybacking. COMAR 23.03.03.12C.

Whether roofing repair services could ever be characterized as a "good" or "commodity," they were certainly among the "requirements" of the Board of Education to maintain adequate school facilities. The AEPA contract utilized by the Board of Education appears to be a form of pooling. In electing to use such a contract, the Board of Education perceived benefits in terms of cost and other factors.[29]

One might read the BPW regulations narrowly to allow participation in intergovernmental cooperative purchasing organizations only for the purchase of goods and commodities. In that view, the regulations were simply meant to incorporate ED § 5–112(a)(3)—it would not be the first time that a regulation simply reiterated a statute. But it seems unlikely that the BPW's three regulations authorizing the use of cooperatives were meant to pertain to the purchase of pencils and textbooks—items not within the purview of the BPW or IAC.

---

**29.** The Board of Education's purchasing manager testified as to the benefits of the contract in terms of cost savings.

Moreover, the BPW placed these regulations all in a chapter of regulations devoted to public school construction that it entitled "Construction Procurement Methods."

     In approving and funding the various roofing services contracts submitted by the Board of Education, the BPW agreed that they were within the purview of its regulations.[30] Thus, when it utilized cooperative purchasing contracts for roof repair, the Board of Education was not engaged in its own frolic and detour. The contracts were entered into and funded with the express approval of the two agencies that the General Assembly has directed to oversee local school construction. Indeed, in discussing the type of intergovernmental cooperative purchasing arrangements permitted under the BPW regulations, an IAC report alluded to the roofing construction contracts of the Board of Education to illustrate the benefits of a purchasing cooperative. Interagency Committee On School Construction, Alternative Approaches to the Construction of Public School Facilities: Annual Report on the Status of Alternative Procurement, Project Delivery, and Financing for Maryland Public School Construction 15 (2007).[31]

---

**30.** While the interpretation of a regulation is ultimately a question of law to be resolved by the courts, deference is due to the interpretation of the agency that adopted the regulation. *See Maryland Board of Public Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. 482, 520, 42 A.3d 40 (2012). Deference is particularly appropriate where, as here, the regulation is adopted under a specific delegation by the Legislature. *See* note 24, above.

**31.** The report noted:

Maryland has seen an increase in *intergovernmental purchase agreements* for school construction projects, a process in which an LEA procures construction services through another governmental agency's previously competed contract with a vendor. The method appears to work best for small projects that involve very uniform materials, standard construction details, and extensive, multi-project scopes, such as roofing and paving. *Baltimore County Public Schools* has procured roofing replacements through the Pennsylvania Education Joint Purchasing Council (PAEJPC), a member of the twenty-two state Association of Educational Purchasing Agencies (AEPA). The AEPA solicits bids for products and services through national advertisements and awards to the lowest, responsible, and responsive bidder. PAEJPC members who use the program benefit from the

In sum, ED § 5–112 embodies a longstanding requirement that local school systems generally use competitive bidding for procurement. But that prescription cannot be viewed in isolation from the history of the State's growing involvement in local school construction, the significant authority delegated to the BPW and IAC to oversee school construction, and the several authorizations for local school systems to use alternative methods of financing, procurement, and project delivery (of which the exception in ED § 5–112(a)(3) is just one example). The pertinent regulations, as applied by the BPW and IAC, allow for greater use of intergovernmental purchasing cooperatives for construction services.

## Conclusion

We hold that ED § 5–112 does not bar the Board of Education from procuring its needs for roofing repair services through an intergovernmental purchasing cooperative when it acts pursuant to the authority of a BPW regulation that had been adopted in accordance with a legislative delegation of authority to the BPW. Whether it is wise to use a purchasing consortium for roof repair services is not for us to assess; we only determine whether that decision was within the authority granted to the Board of Education by the BPW under its statutory delegation—a delegation that the Legislature may retract or modify. If those decisions are imprudent, it is the General Assembly that holds the ultimate trump card.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

ability to pick from quality contractors at pre-established bid prices for any type of roofing system. Since members do not have to solicit their own bids, project approval times can be significantly reduced. All multi-state vendors are fully bonded and have met the bidding requirements for various states. BCPS reports that it has enjoyed guaranteed, quality workmanship overseen by the PAEJPC, and that the ability of the roofing services vendor to pick qualified roofing contractors has provided an almost risk-free roof replacement program. The services that are currently being provided include full time project management, saving roofing inspector man-hours for the school system.