## LABOR & EMPLOYMENT

PUBLIC SCHOOLS – SICK AND SAFE LEAVE – STATUTORY
    CONSTRUCTION – WHETHER DAILY SUBSTITUTE
    TEACHERS ARE EXCLUDED FROM EARNING SICK AND
    SAFE LEAVE UNDER THE MARYLAND HEALTHY WORKING
    FAMILIES ACT

December 4, 2018

*The Honorable Nancy J. King*
*The Honorable Thomas M. Middleton*

You have asked for our opinion about the applicability of the
Maryland Healthy Working Families Act (the "Act"), *see* Md.
Code Ann., Labor & Empl. ("LE") §§ 3-1301 to 3-1311, to so-
called "daily substitute teachers" employed by Maryland's local
school systems. The Act requires covered employers, including
State and local governments, to provide their employees with a
minimum amount of earned "sick and safe leave." LE § 3-1304.
With certain exceptions, employers that employ 15 or more
employees must provide paid sick leave, while employers with 14
or fewer employees must provide unpaid leave. LE § 3-1304(a).
Prior to the passage of the Act, most regular public school teachers
in Maryland already earned sick leave, but the newly enacted
statute has raised questions about whether substitute teachers are
also entitled to such leave. The local school systems believe that
the Act requires them to provide sick leave to "long-term"
substitute teachers but question whether the Act applies to "daily"
substitute teachers who are offered assignments on a day-to-day
basis. *See* Letter from Leslie R. Stellman, Counsel to the Public
School Superintendents of Maryland, to Attorney General Brian E.
Frosh (Feb. 28, 2018) ("Stellman Letter").

In response to an earlier request for advice on this issue, the
Counsel to the General Assembly advised that whether the Act
applies to daily substitute teachers in a county might depend on
"how [that] particular school system handles the hiring of substitute
teachers." Letter from Sandra Benson Brantley, Counsel to the
General Assembly, to Delegate Dereck E. Davis (Feb. 6, 2018).
The Counsel to the General Assembly further advised that,
although it was "very possible" that many daily substitute teachers
would not be covered by the Act, a local school district "should
consult with its own counsel to determine the [Act's] impact on
[the] substitute teachers" in its jurisdiction. *Id.* Because the local
school systems are seeking more definitive guidance, however, you

have asked whether daily substitute teachers are *categorically* excluded from the Act, such that, as a class, they do not accrue— and may not use—sick and safe leave.

In our opinion, although many (and perhaps most) daily substitute teachers will not be entitled to earn sick leave under the Act, the Act does not categorically exclude all daily substitutes. The Act provides for only a handful of limited exceptions, and while one of those exceptions will exclude many daily substitute teachers, none will exclude *all* daily substitutes. Although the legislative history includes evidence suggesting that some members of the General Assembly may not have intended the Act to cover daily substitute teachers, that legislative history cannot override the statutory language, especially when that language is read in context and in light of the purpose behind the Act. Moreover, given the remedial purpose of the Act to expand access to sick leave, we will not read an exception into the statute that excludes such a wide class of employees from the Act's protections. That said, the Commissioner of Labor & Industry, who is responsible for the implementation of the Act, has at least some discretion to clarify how certain provisions of the Act will apply in practice to daily substitutes.

# I

## Background

### A. *Daily Substitute Teachers*

Maryland's local school systems employ both long-term substitute teachers and so-called "daily" substitute teachers to cover the classes of regular teachers who are absent.[1] As we comprehend the distinction, long-term substitutes are generally hired to fill the same assignment for an extended period of time and are expected to work every day during that assignment, whereas "daily" substitute teachers are offered assignments on a short-term, day-to-day basis and are free to decline an assignment for any

---

[1] The school systems also have other substitute employees who are not teachers, such as substitute lunch and recess monitors and substitute clerical employees. *See, e.g.*, Howard County Public Schools, *Substitute Teacher Handbook* 14. Although there may be questions about whether those other substitute employees are covered by the Act, this opinion will focus primarily on substitute teachers, as they were the focus of your opinion request.

reason on any particular day.[2]  *See* Stellman Letter at 2.  In other words, daily substitutes work only when they are offered an assignment and choose, in their discretion, to accept that assignment.  In some cases, daily substitutes will sign up in advance for an assignment, while in other cases they might be called on the morning of an assignment.[3]  Some daily substitutes work only sporadically, but many daily substitutes work more frequently.

School districts have different criteria for classifying substitute teachers as either long-term or "daily" substitutes, but it appears that many districts classify a substitute as long-term if he or she has an assignment that lasts over ten consecutive school days.  *See, e.g.*, Carroll County Public Schools, *Substitute Teacher Handbook* 5, https://www.carrollk12.org/admin/hr/employment opportunities/Documents/CCPS%20Substitute%20Handbook%20 17-18.pdf (long-term status begins with assignment of 10 consecutive days); Washington County Handbook at 7 (long-term substitute pay begins on the 11th day of assignment to replace the same regular teacher); Howard County Handbook at 13 (long-term substitute pay begins on 11th consecutive day for same teacher in the same assignment); *but see* Harford County Public Schools, *Substitute Teacher Handbook* 6, http://www.hcps.org/departments/ docs/humanresources/SEMS/Handbook.pdf (long-term positions are for a minimum of 16 days).  The school systems believe that long-term substitute teachers are entitled to sick leave under the Act but question whether the same is true of daily substitutes.  *See* Stellman Letter at 2.

---

[2] There is also a third category of substitute teachers:  teachers who are regular, full-time employees of the school system but, rather than being assigned to one particular classroom every day, work where needed to fill in for absent teachers.  Those substitute teachers, as we understand it, already receive sick leave.

[3] Daily substitute teachers may cancel an assignment, but at least some school systems reserve the right to remove a substitute from the approved list if that substitute frequently cancels assignments at the last minute.  *See, e.g.*, Howard County Handbook at 9; Washington County Public Schools, *Substitute Teacher Handbook* at 4, http://wcpshr.com/sites/ wcpshr.com/files/documents/2018%20Substitute%20Teacher%20 book.pdf.

### B. Statutory Background

The General Assembly passed the Maryland Healthy Working Families Act during the 2017 legislative session, *see* H.B. 1, 2017 Leg., Reg. Sess., but the bill was vetoed by the Governor. After the Legislature voted to override the veto at the beginning of the 2018 session, the statute went into effect on February 11, 2018. *See* 2018 Md. Laws, ch. 1; *see also* Md. Const., Art. II, § 17(d) (providing that "[a]ny Bill enacted over the veto of the Governor . . . shall take effect 30 days after the Governor's veto is overridden, or on the date specified in the Bill, whichever is later.").

Under the Act, an employer generally must provide its employees with earned "sick and safe leave." LE § 3-1304. That leave "shall accrue at a rate of at least 1 hour for every 30 hours an employee works." LE § 3-1304(b). But employees are not entitled to accrue leave during any two-week pay period "in which the employee worked fewer than 24 hours total," or during any one-week pay period if the employee worked fewer than 24 hours combined over the current and previous pay period. LE § 3-1304(c)(5). Alternatively, instead of providing for accrued leave, an employer "may award to an employee the full amount" of leave that the employee "would earn over the course of the year" at the beginning of the year. LE § 3-1304(d).[4]

The Act also outlines the circumstances under which employees are allowed to use their leave. An employer "shall allow" employees to use the sick and safe leave they have earned and accrued: to care for their own illness, injury, or condition; to care for a family member; to obtain preventative medical care for themselves or their family; for parental leave; or for certain necessary absences "due to domestic violence, sexual assault, or stalking committed against" them or a family member. LE § 3-1305(a). When the need to use the leave is "foreseeable," the employer may "require an employee to provide reasonable advance notice of not more than 7 days." LE § 3-1305(b)(1). But, if the need is not foreseeable, the employee must simply "provide notice

---

[4] Employers are not required to allow an employee to earn more than 40 hours of sick and safe leave in a given year or to allow an employee to accumulate more than 64 hours at any given time. LE § 3-1304(c). Employers also are not required to compensate employees for unused leave. LE § 3-1302(b)(1).

to [the] employer as soon as practicable."[5] LE § 3-1305(b)(2). The employee's request to use sick leave may be denied if the employee "fails to provide" the required notice and "the employee's absence will cause a disruption to the employer." LE § 3-1305(b)(3)(i).[6]

The Act applies broadly to "employees," LE § 3-1304(a), but it exempts some workers from its scope. As an initial matter, the Act defines "employee" to exclude workers (1) who qualify as independent contractors under LE § 8-205, (2) who serve as real-estate brokers paid by commission under LE § 9-222, (3) who are under the age of 18 "before the beginning of the year," (4) who are employed in the agricultural sector under certain circumstances, (5) who are employed by temporary services agencies when the agency "does not have day-to-day control over the work assignments and supervision" of the worker, or (6) who are "directly employed by an employment agency to provide part-time or temporary services to another person." LE § 3-1301(e). Those six categories of workers, therefore, are not covered by the Act. In addition, the Act excludes some workers that otherwise meet the definition of "employee." As is relevant here, the Act "does not apply to": (1) an employee who "regularly works less than 12 hours a week for an employer," LE § 3-1303(a)(1), or (2) an employee who "is called to work by the employer on an as-needed basis in a health or human services industry" and who "can reject or accept the shift offered by the employer," "is not guaranteed to be called on to work by the employer," and "is not employed by a temporary staffing agency." LE § 3-1303(a)(3).

In terms of the applicability of these rules to the local school systems, "employer" is defined to include "a unit of State or local government." LE § 3-1301(f)(1). However, the Act merely establishes minimum requirements. Thus, the Act generally does not preempt other laws that provide sick and safe leave benefits that are "more generous than required" under the Act. LE § 3-

---

[5] The employee must also "generally comply with the employer's notice or procedural requirements for requesting or reporting other leave, if those requirements do not interfere with the employee's ability to use earned sick and safe leave." LE § 3-1305(b)(2)(ii).

[6] The Act allows an employer to "adopt[] and enforc[e] a policy that prohibits the improper use of earned sick and safe leave, including prohibiting a pattern of abuse of sick and safe leave." LE § 3-1302(b)(5).

1302(b)(3).[7]  Similarly, the Act does not "require an employer to modify an existing paid leave policy" where that policy either "permits an employee to accrue and use leave under terms and conditions that are at least equivalent" to those in the Act, or "does not reduce employee compensation for an absence due to sick or safe leave."  LE § 3-1302(b)(2).  In addition, "if a unit of State or local government's sick leave accrual and use requirements meet or exceed the sick and safe leave provided for under [the Act]," the State or local government employees "who are part of the unit's personnel system are subject to the unit's law, regulations, policies, and procedures" for "accrual and use of sick leave," "grievances," and "disciplinary actions," instead of the Act.  LE § 3-1303(c).

Finally, the Act provides a mechanism for enforcement.  If an employee believes an employer has violated the Act, "the employee may file a written complaint" with the Commissioner of Labor and Industry (the "Commissioner") within the Department of Labor, Licensing and Regulation ("DLLR").  LE § 3-1308(a).  The Commissioner then conducts an investigation and attempts to "resolve the issue informally through mediation."  LE § 3-1308(b)(1).  In the event that the Commissioner cannot resolve the issue through mediation and finds that an employer has violated the Act, the Commissioner "shall" order the "payment of the full monetary value of any unpaid earned sick and safe leave and any actual economic damages."  LE § 3-1308(b)(2)(i), (ii)2.  The Commissioner also has discretionary authority to require the employer to pay "up to three times the value of the employee's hourly wage for each violation" or to "assess a civil penalty of up to $1,000 for each employee for whom the employer is not in compliance" with the Act.  LE § 3-1308(b)(2)(ii)3, 4.

If an employer does not comply with the Commissioner's order, the Commissioner may bring an action in circuit court to enforce the order or (if the employee consents) may ask the Attorney General to bring an action on the employee's behalf.  LE § 3-1308(c)(2)(i).  Alternatively, an employee may bring his or her own civil action to enforce the order.  LE § 3-1308(c)(2)(ii).  But neither the Commissioner nor an employee may bring a civil action under the Act other than to enforce an order issued by the

---

[7] The Act does preempt "the authority of a local jurisdiction to enact a law on or after January 1, 2017, that regulates sick and safe leave provided by an employer other than the local jurisdiction."  LE § 3-1302(d)(1).  That provision grandfathered a paid sick leave ordinance enacted by Montgomery County, which continues to apply in that county to the extent that it is more generous than the Act.

Commission. *See* LE § 3-1308. Finally, the Commissioner may adopt regulations "necessary to carry out" the provisions of the Act. LE § 2-106(b)(3).

### C. *Legislative History*

The Act was originally introduced as House Bill 1 at the beginning of the 2017 legislative session. As introduced, the bill provided that it would not apply to an employee who "regularly works less than 8 hours a week," but did not include any express exception for employees working on an on-call or as-needed basis. *See* H.B. 1 (first reader). During the hearings on the bill, two school systems submitted written testimony based on an apparent belief that the bill, as drafted, would apply to daily substitute teachers. Those school systems expressed concerns about the financial and practical consequences if daily substitutes were covered by the law. For example, the Anne Arundel County School System urged an unfavorable report, testifying that:

> House Bill 1 is an unfunded mandate with significant fiscal implications. This bill would apply to temporary employees, including substitute teachers. Currently, substitute teachers receive an invitation to work at a school, and they have the ability to accept or reject the assignment based upon their needs and interests. Under House Bill 1, Anne Arundel County Public Schools and local school systems in the State would be required to provide sick leave for these substitute teachers and other temporary employees at an increased cost to local school systems. The costs would be significant. Under this bill school systems would be required to cut resources from other places in order to afford leave for individuals in their system who currently do not receive leave, and can choose to not work on certain days.

*Hearing on H.B. 1 Before the House Econ. Matters Comm.*, 2017 Leg., Reg. Sess. (Feb. 10, 2017) (written testimony of the Anne Arundel County Board of Education). Similarly, the Harford County Board of Education testified:

> This bill would provide leave benefits to all budgeted staff working at least .5 FTE [i.e.,

Full-Time Equivalent] to accumulate paid sick leave. It should be noted that staff working below .5 FTE are typically considered to be substitutes. A substitute receives an invitation to work and has the ability to accept or reject the assignment based upon her/his needs and interest. This raises the question, would the employer be compelled to pay accumulated sick and safe leave to the substitute (and all subsequent invited substitutes) that reject the assignment? It is estimated that payment of sick and safe leave could cost an additional $56,000 per year [in] salary costs. . . .

Paid leave benefits are given at the beginning of the fiscal year for use during the year. We would not be able to determine and front-load the amount of sick and safe leave hours individuals would earn over the course of the year. Communication and administration of a different leave practice for staff whose work hours are fewer than those covered under our collective bargaining agreements would be difficult. It would require additional programming of our leave administration [and] payroll systems and pose an increased work burden on staff to monitor and assure compliance.

*Id.* (written testimony of the Harford County Board of Education).

During the hearings, representatives of employers in other sectors expressed similar concerns that the bill, as drafted, would apply to on-call workers in their sectors. *See id.*; *see also Hearing on S.B. 230 Before the Senate Finance Comm.*, 2017 Leg., Reg. Sess. (Feb. 9, 2017).[8] For example, the Maryland-National Capital Homecare Association ("MNCHA") requested an amendment to exempt so-called pro re nata ("PRN") employees in the healthcare industry, explaining that "[i]t is a well-known practice in the medical field" for employers to use "'PRN' employees," who "work[] when called to fill in for an absent employee or to cover a special situation or contract[] to work a certain number of hours although not always the same days or hours." *Hearing on H.B. 1* (written testimony of MNCHA). Similarly, the Society for Human

---

[8] Senate Bill 230 was the cross-filed version of House Bill 1.

Resource Management raised concerns about the applicability of the Act to PRN employees in hospitals, explaining that "[a] hospital regularly employs per diem staff," who "may be regularly scheduled to work at least eight hours per week some weeks and/or for a limited duration but not on a regular basis." *Id.* (written testimony of the Society for Human Resource Management).[9]

After the hearings, the General Assembly amended the bill to expressly exclude certain on-call employees employed on an as-needed basis in "a health or human services industry." H.B. 1 (third reader). The purpose of this amendment, according to a summary document prepared by the Department of Legislative Services, was to "exempt 'PRN' workers." *House Bill 1 Summary – Maryland Healthy Working Families Act*, H.B. 1, 2017 Leg., Reg. Sess. at 4 (comparing House Bill 1 with the Senate's amendments). The summary document further noted that:

> Nurses, X-ray technicians, respiratory therapists and many other healthcare workers "work PRN," which stands for "pro re nata," a Latin phrase that roughly translates to "as needed" or "as the situation arises." A PRN employee works when called, to fill in for an absent employee or to cover a special situation. PRN gives regular employees a chance to make extra money, but some skilled medical workers prefer working PRN because it gives them freedom to choose shifts and assignments.

*Id.* Although daily substitute teachers have many of the same characteristics as PRN workers in the healthcare industry, the amendments to the bill made no reference to daily substitute teachers or to the education industry.

---

[9] *See also Hearing on H.B. 1* (written testimony of the Community Behavioral Health Association (explaining that "our members rely on on-call staff to fill open shifts," and those staff "have the discretion to accept or refuse any shift offered")); *id.* (written testimony of Shepherd's Staff In-home Care, LLC (explaining that "[m]ost of our employees are caregivers who work with clients on an as-needed basis")); *id.* (written testimony of the Visiting Angels (explaining that many caregivers providing aid to seniors work "PRN" and supporting an exemption for PRN employees)); *id.* (written testimony of Kaiser Permanente).

Then, during the debate over the bill (as amended) on the Senate floor, Senator King had the following colloquy with Senator Middleton, the floor leader for the bill and the sponsor of the cross-filed Senate version:

> Senator King: Can I ask a question of the floor leader?
>
> Senator Middleton: You certainly may.
>
> Senator King: I've had some questions about substitute teachers for the school systems and whether they are covered. Can you address that for me?
>
> Senator Middleton: Certainly, this question came up before the Committee. The way substitute teachers are, many school systems have substitute teachers on call, you sign a list, and when there's an absent teacher you call that person. They can come in or they don't. This bill does not apply to those. But some of your larger jurisdictions actually have workers that sign up as substitute teachers. They're there – when the school system calls them, they're there to work. Those are regular employees of the school system. They're paid differently than regular substitute teachers. Those teachers, just like all other county employees that don't have a sick leave benefit, now get a benefit under this bill. So they would be entitled to the same benefit that other contractual employees of the school system would have.
>
> Senator King: Okay, but if I'm a substitute teacher that comes in and substitutes maybe a day a week or maybe four or five times a month, they're not covered, correct?
>
> Senator Middleton: If they call you and you have an option of coming in or not, no, you're not covered.
>
> Senator King: Okay. Alright, thank you.

Senate Proceedings No. 56, 2017 Leg., Reg. Sess. (March 31, 2017).

The bill, as amended, passed both houses of the General Assembly. The Governor vetoed the bill, but when the General Assembly returned for its next legislative session, the Legislature overrode the veto. Because a bill enacted over the Governor's veto ordinarily goes into effect 30 days after the legislative override, *see* Md. Const., Art. II, § 17(d), the Legislature considered a separate bill that would have delayed the effective date of the Act until July 1, 2018. *See* S.B. 304, 2018 Leg., Reg. Sess.

As the General Assembly considered that legislation, the Maryland Association of Boards of Education ("MABE") requested "an amendment to treat daily, on-call as-needed, employees in the public school setting in the same manner as daily on-call as-needed employees in the health and human [services] industries." *Hearing Before the Senate Finance Comm. on S.B. 304*, 2018 Leg., Reg. Sess. (Jan. 24, 2018) (written testimony of MABE). The amendment would have changed the health-or-human-services exception to read: "is called to work by the employer on an as-needed basis in a health or human services industry, *or by a county board of education*." *Id.* (emphasis in original). In support of its proposed amendment, MABE expressed concern that the law as enacted would be "very likely" to "trigger" paid sick leave requirements for "thousands of daily substitute teachers." *Hearing Before the House Econ. Matters Comm. on S.B. 304*, 2018 Leg., Reg. Sess. (Feb. 13, 2018) (testimony of John Woolums, Dir. of Gov't Relations for MABE). In response, Delegate Dereck Davis, one of the sponsors of the sick leave law during the prior session, stated that:

> There's sort of been a lot of, I guess, confusion, if you will, as it relates to whether or not this even applies to substitute teachers. I don't want to speak for them because I don't have it before me—or speak for him because I don't have it before me—but I think the Attorney General [in the advice letter from the Counsel to the General Assembly] raised serious doubt as to whether or not this applies. I do know, or I believe, one of the tests for an independent contractor, which is what I believe they are . . . they have to show up every day, the hours and so forth. A substitute teacher does not have to show up every day. A substitute teacher essentially chooses their own hours. If they call . . . if you call me, Dereck Davis, and say I need you to come in

on Tuesday and sub, I can go, n[o], I'm going to the beach on Tuesday. I'm available the rest of the week. That's starting to sound like an independent contractor and not an employee. So I think substantial doubt exists as to whether or not this even applies to substitute teachers.

*Id.* (statement of Del. Davis). Neither the House nor the Senate adopted MABE's proposed amendment and, in any event, the bill delaying the Act's effective date did not pass. The Act went into effect in February of 2018.

## II

### Analysis

Your question requires us to interpret the Maryland Healthy Working Families Act to determine if daily substitutes are categorically excluded from the Act's requirements. In analyzing that question, we apply the familiar principles of statutory construction used by the Maryland courts. The "cardinal rule" of statutory construction is, as always, "to ascertain and effectuate the intent of the Legislature." *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 358 (2013) (internal quotation marks omitted). "To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute," *State v. Bey*, 452 Md. 255, 265 (2017) (internal quotation marks omitted), reading the words in accordance with "their natural and ordinary meaning." *Davis v. State*, 426 Md. 211, 218 (2012). But we do not read the words of the statute "in a vacuum." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). Instead, we interpret the language in light of "the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. If the statutory language, read in context, "is unambiguous and clearly consistent with the statute's apparent purpose," the inquiry will "ordinarily" end, "and we apply the statute as written, without resort to other rules of construction." *Id.* at 275.

If, however, the statute is ambiguous, we must "resort to other recognized indicia" of legislative intent, such as "the structure of the statute . . .; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and

legal effect of various competing constructions." *Witte v. Azarian*, 369 Md. 518, 525-26 (2002). In doing so, we must avoid interpretations that are "absurd, illogical, or incompatible with common sense." *Lockshin*, 412 Md. at 276. Finally, where a statute is "remedial in nature," it must be "liberally construed . . . to effectuate [its] broad remedial purpose," and any "exemptions from remedial legislation must be narrowly construed." *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016) (internal quotation marks omitted) (alteration in *Lockett*).

## A. *Are Daily Substitutes "Employees" Under the Act?*

The threshold question is whether daily substitute teachers are "employees" within the meaning of the Act. In our opinion, they are. "Employee" is a broad term, the ordinary meaning of which easily encompasses substitute teachers. *See Webster's Encyclopedic Unabridged Dictionary* 638 (1996) (defining "employee" as "a person working for another person or a business firm for pay"). The only way in which the Act limits that ordinary meaning of employee is by specifying that, for purposes of the Act, the term "employee" does not include an individual who: (1) works as an independent contractor under § 8-205 of the Labor & Employment Article, (2) works as a real-estate broker or salesperson not covered by Title 9 of the Labor & Employment Article, (3) is under the age of 18, (4) is employed in certain agricultural sectors, (5) performs certain work through a temporary services agency, or (6) works for an employment agency to provide part-time or temporary services to another person. LE § 3-1301(e). None of those categories encompass daily substitute teachers; therefore, daily substitutes are "employees" within the meaning of the Act. *See, e.g.*, *Rose v. Fox Pool Corp.*, 335 Md. 351, 360 (1994) ("It is well settled that where a statute specifically lists certain classes of persons as excluded from coverage, the express exclusion of certain persons raises the inference that all other persons not excepted are within the statute's coverage.").

Although daily substitutes may be similar in some ways to independent contractors, they do not meet the legal criteria for independent contractors under LE § 8-205. That provision classifies workers as independent contractors only if, among other things, they perform their work "free from control and direction over [their] performance." LE § 8-205(a)(1). But, unlike independent contractors, daily substitutes are subject to significant "control and direction" over their work by their employers. *See, e.g.*, Harford County Handbook at 2-5, 7-20 (outlining detailed policies and procedures for substitute teachers); Howard County Handbook at 6-11, 14-17 (same); Washington County Handbook

at 6-19 (same). Thus, daily substitutes are not independent contractors and—because none of the other statutory exclusions from the definition of "employee" apply to them either—they are "employees."[10]

## B. Do Any of the Act's Exceptions Categorically Exclude Daily Substitutes?

Because a daily substitute is an "employee" under the Act, we next consider whether daily substitute teachers are among those "employees" who fall within other exceptions from the Act. Two such exceptions are potentially relevant here: the exception for employees who "regularly work[] less than 12 hours a week," LE § 3-1303(a)(1), and the exception for "as-needed" employees in "a health or human services industry," LE § 3-1303(a)(3). We will analyze each in turn.

### 1. Employees Who "Regularly Work Less than 12 Hours a Week"

The first of these exceptions provides that the Act "does not apply to" an employee who "regularly works less than 12 hours a week for an employer." LE § 3-1303(a)(1). As an initial matter, we note that regardless of how this statutory language is interpreted, at least some daily substitute teachers will unquestionably fall within the exception. For example, a substitute teacher who generally works for a school system just one 8-hour day each week will "regularly work[] less than 12 hours a week" under any possible interpretation of that phrase. But you have asked whether daily substitute teachers are *categorically* exempt from the Act. To determine whether this exception categorically excludes daily substitutes, we start with the "natural and ordinary meaning" of the statutory language, *Davis*, 426 Md. at 218, keeping in mind the surrounding context and "the purpose, aim, or policy

---

[10] The local school systems seem to concur that substitute teachers are their "employees." *See* Stellman Letter at 2. Although Delegate Davis (one of the sponsors of the Act in 2017) speculated during the next legislative session that daily substitutes might be independent contractors, "little weight is to be accorded to post-enactment statements of legislative intent, even by the legislators who passed the particular law." *Building Materials Corp. of Am. v. Board of Educ. of Baltimore County*, 428 Md. 572, 592 (2012). In any event, the plain language of the statute makes clear that daily substitutes are employees rather than independent contractors.

of the Legislature in enacting the statute," *Lockshin*, 412 Md. at 275.

In our opinion, the most natural way to read the phrase "regularly works less than 12 hours a week" is that "regularly" means "usually [or] ordinarily,"[11] or "[c]ustomar[il]y, usual[ly], or norma[ly],"[12] such that part-time employees are not covered by the Act when they usually work fewer than 12 hours a week. *See Montgomery County v. Deibler*, 423 Md. 54, 67 (2011) (explaining that it is "useful" to start with dictionary definitions, though such definitions do not "provide dispositive resolutions of the meaning of statutory terms" (internal quotation marks omitted)); *see also Smith v. Yurkovsky*, 265 Conn. 816, 827 (2003) (interpreting the phrase "regularly employed . . . over twenty-six hours per week" in a workers' compensation statute to "mean[] that [an employer] usually" employs the worker over twenty-six hours per week, or that he "does so most of the time, so that such employment becomes the rule and not the exception" (internal quotation marks omitted; emphasis omitted)); *Thomas Bros. v. Cargill, Inc.*, 276 Mont. 105, 110-11 (1996) (interpreting "regular work" to mean "that which [an employee] does normally, typically or naturally," in accordance with the "plain meaning" of "regular" as "normal, typical or natural" (internal quotation marks omitted)).

Indeed, that interpretation has already been adopted by the administrative agency charged with administering the Act; the Commissioner of Labor & Industry has advised that employers should "us[e] the everyday meaning of the word" regularly, "which is 'normal or customary,'" in construing the Act. DLLR, *Maryland Healthy Working Families Act: Frequently Asked Questions* (March 9, 2018), http://www.dllr.state.md.us/paidleave/ paidleavefaqs.pdf. The Commissioner's interpretation, though not promulgated by regulation, is entitled to at least some deference, and it reinforces our own sense of the most natural meaning of the exception. *See Stachowski v. Sysco Food Servs. of Baltimore, Inc.*, 402 Md. 506, 517 (2007) (explaining that agency interpretations of the statutes they administer are ordinarily entitled to deference, though the precise weight afforded depends on several factors, including whether the agency has made that interpretation by regulation). Under that most natural reading, the Act does not categorically exclude all daily substitute teachers because at least

---

[11] *Webster's Encyclopedic Unabridged Dictionary* 1624 (1996).

[12] *The American Heritage Dictionary* 1041 (2d ed. 1985).

some of them will usually work 12 hours a week or more. *See* Stellman Letter at 2.

The school systems suggest that "regularly" might have a different meaning in this context, positing that the Legislature's use of the word could reflect an intent to exclude from the Act all employees, like daily substitute teachers, who lack a regular work schedule and are not expected to work a set number of hours each week. *See* Stellman Letter at 5. In other words, under that alternative interpretation, an employee without a set schedule and set hours might "regularly work" *zero* hours a week, such that the employee always falls within the statutory exclusion no matter how many hours the employee actually works. For the reasons explained below, although there are some definitions of "regularly" that could be read in the abstract to support such an interpretation, that interpretation would not be consistent with either the language of the statute in context or with the purposes behind the Act.

We recognize that alternative uses of the word "regularly" could arguably imply that an employee must have a fixed schedule to be covered by the Act. *See, e.g.*, *Webster's Encyclopedic Unabridged Dictionary* 1624 (1996) (defining "regularly" to sometimes mean "at regular times" or "according to plan, custom, etc."); *The American Heritage Dictionary* 1041 (2d ed. 1985) (including, as a definition of "regular," "[c]onforming to set procedure," "[c]onstant" or "not varying"). In keeping with those definitions, Maryland courts have sometimes interpreted "regularly" to suggest a fixed course of conduct. As the Court of Appeals put it in one case, the word "regularly" tends to mean "in a regular manner or in accordance with some prescribed or adopted rule or order[,]" which "'implies method, continuity and consistency, and excludes the idea of incidental, occasional, or casual service or use.'" *Comptroller v. M.E. Rockhill, Inc.*, 205 Md. 226, 235 (1954) (citing *Carter v. Reardon-Smith Line*, 148 Md. 545, 559 (1925)); *see also Allstate Ins. Co. v. Humphrey*, 246 Md. 492, 497 (1967) (listing several dictionary definitions of "regular," some of which imply that regular actions take place at fixed times or at fixed intervals); *Hodgson v. Flippo Const. Co.*, 164 Md. App. 263, 270 (2005) (finding that "[t]he word 'regular'

implies a uniform course of conduct" (quoting *McElroy Truck Lines, Inc., v. Pohopek*, 375 Md. 574, 577 (2003)).[13]

Nonetheless, after considering the words of the Act in context and reading them in light of the Act's purpose, we do not believe that the General Assembly intended to categorically exclude all employees who do not work a regular schedule or a set number of hours per week. In our view, the context surrounding the word "regularly" in the statute more strongly supports reading the term in accordance with its ordinary meaning as "usually," rather than as requiring a fixed schedule. After all, creating an exception for employees who "regularly work less than 12 hours a week" would be an awkward way to exclude all employees who do not work according to a set schedule or set hours, given that the exception establishes a threshold based on the hours an employee works, not the hours for which the employee is scheduled.

What is more, reading the exception to apply only to those employees who usually work less than 12 hours a week is far more consistent with the purpose of the Act. *See* Floor Report H.B. 1, 2017 Leg., Reg. Sess. at 10 (explaining that the Act is "needed" because "[m]any Marylanders lack the ability to take a day off when they are sick" and noting that the bill will provide new sick leave benefits to "almost 800,000 Maryland workers"). A remedial statute, like the Act, must be "liberally construed . . . to effectuate [its] broad remedial purpose," and any "exemptions" from the statute "must be narrowly construed." *Lockett*, 446 Md. at 424 (internal quotation marks omitted); *see also Pak v. Hoang*, 378 Md. 315, 325 (2003) (explaining that "statutes are remedial in nature if," for example, "they are designed to correct existing law, to redress existing grievances and to introduce regulations conducive to the public good" (internal quotation marks and citation

---

[13] However, it is worth noting that, even under these definitions of "regularly," it is not clear that *every* employee without a regular schedule of some kind would be excluded from the Act. Rather, a substitute teacher who almost always works more than 12 hours a week would be engaging in a "uniform course of conduct," *Hodgson*, 164 Md. App. at 270, and would be doing so with "method, continuity and consistency," *M.E. Rockhill, Inc.*, 205 Md. at 235, regardless of whether that substitute had a fixed schedule or guaranteed hours. Defining "regularly" to require a uniform course of conduct, therefore, still would not categorically exclude all daily substitute teachers from the Act's protections.

omitted)).[14] Applying those principles here, we must interpret the exception narrowly to further the legislative goal of securing sick leave for tens of thousands of previously unprotected Marylanders. Reading the statute to categorically exclude all employees without a regular schedule would not further that purpose and would deny the Act's protections not just to daily substitute teachers, but to many other workers as well.

Indeed, a significant percentage of employees have an irregular work schedule, in sectors as diverse as the entertainment, retail, personal services, real estate, and transportation industries. *See* Economic Policy Institute, *Irregular Work Scheduling and Its Consequences*, at 1, 2 (April 9, 2015), https://www.epi.org/files/

---

[14] In some instances, the Court of Appeals seems to define "remedial" statutes more narrowly to mean just "those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries" and that "do[] not affect substantive or vested rights." *Johnson v. Mayor & City Council of Baltimore*, 430 Md. 368, 385 (2013) (quoting *Langston v. Riffe*, 359 Md. 396, 408-09 (2000)); *see also Langston*, 359 Md. at 409 (noting that an act "is remedial in nature when it provides only for a new method of enforcement of a preexisting right" (internal quotation marks omitted)). However, the Court seems to use that definition of "remedial" only when determining whether legislation should apply retroactively. *See Johnson*, 430 Md. at 381-82 (explaining that legislation governing procedures or remedies, unlike most legislation, is presumed to apply retroactively). When instead determining whether statutory language should be construed broadly to advance a remedial purpose, the courts have characterized remedial statutes to include those "designed to correct existing law, to redress existing grievances and to introduce regulations conducive to the public good." 70 *Opinions of the Attorney General* 87, 90 (1985) (quoting *State v. Barnes*, 273 Md. 195, 208 (1974)). In fact, in *Johnson*, the Court held that an amendment to the Workers' Compensation Act was not "remedial" and should not be applied retroactively, while at the same time acknowledging that the Workers' Compensation Act, as a whole, "is a remedial statute" that should be construed liberally to advance its "benevolent purposes." 430 Md. at 377 (internal quotation marks omitted). In any event, this statutory exception for employees who "regularly work[]" less than 12 hours a week must be read narrowly because, generally speaking, "'[w]hen a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions.'" *Blue v. Prince George's County*, 434 Md. 681, 695 (2013) (quoting Norman J. Singer and J.D. Shambie, *Sutherland Statutes and Statutory Construction* § 47:11 (2013) (internal footnote omitted in *Blue*; alteration in *Blue*)).

pdf/82524.pdf.  According to one estimate, for instance, "about 10 percent of the workforce" in the United States does not have regular hours or regular schedules.  *Id.* at 1.  Those workers are also often among our society's most vulnerable, given that low-income workers are more likely to have irregular work schedules.  *Id.* at 1, 10.  In the absence of any clear indication that the Legislature intended to exclude such a wide swath of workers *en masse* from this remedial statute, we will not read that exception into the statute.  We "cannot assume authority to read into the [statute] what the Legislature apparently deliberately left out."  *Walzer v. Osborne*, 395 Md. 563, 584 (2006) (internal quotation marks omitted).[15]  For all of these reasons, we think the best reading of the statutory language is the most natural one:  that an employee "regularly works less than 12 hours a week" when the employee *usually* or *normally* works fewer than 12 hours.

Of course, in some cases, it may be difficult to determine whether an employee without a regular work schedule usually works less than 12 hours a week.  Thus, the Commissioner will likely need to issue more comprehensive guidance on that topic.[16]  But the mere fact that the statute is ambiguous as applied to some situations does not mean that it is ambiguous as applied to the question here, that is, whether it categorically exempts daily substitute teachers.  *Cf. Allstate Ins. Co.*, 246 Md. at 496 (explaining that the fact "[t]hat a term [in a contract] cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous" as applied to

---

[15] Requiring employees to have a regular work schedule or guaranteed hours would also lead to other results that the Legislature likely did not intend.  Such a requirement, for instance, might call into question whether employees who nearly always work a full 40-hours per week should be excluded from the Act merely because they are not guaranteed to work that many hours or because their weekly schedule is irregular.  Similarly, if the statute required an employee to have a regular schedule in order to earn sick leave, some employers would have an incentive to exclude their employees from coverage simply by refusing to provide those employees with a regular work schedule.

[16] In particular, the Commissioner may need to clarify how the Act is going to apply to new employees, including new daily substitute teachers, when it is not yet clear how many hours per week that employee will regularly work.  Although it may be relatively easy to determine whether an employee regularly works less than 12 hours a week if that employee has a long work history with his or her employer, the same may not be true with respect to new employees without that same work history.

the circumstance at issue).  The language of the exception, read in context and in light of the Act's purpose, does not support a blanket exclusion of *all* daily substitute teachers.

The legislative history, on balance, seems to confirm our conclusion as to the meaning of this exemption, or at the very least does not contradict it.  *See, e.g.*, *State v. Roshchin*, 446 Md. 128, 140 (2016) (explaining that even in instances "when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation").  Despite an indication that some members of the General Assembly did not expect daily substitute teachers to be covered, the legislative record does not establish that the Legislature as a whole intended the exemption for employees who "regularly work[] less than 12 hours a week" to exclude all daily substitutes or all employees who lack a regular schedule.

As an initial matter, the Act's Fiscal & Policy Note suggests that substitute teachers were going to be covered by the Act.  The fiscal note warned that, under the Act, the Montgomery County public school system would "incur a substantial cost" to provide paid sick leave to "3,500 short-term substitute teachers" who were not already covered by the county's preexisting paid sick leave legislation.[17]  Revised Fiscal & Policy Note, H.B. 1, 2018 Leg., Reg. Sess. at 13.  Although the fiscal note did not use the term "daily substitutes," the phrase "short-term" substitutes seems to refer to the same category of teachers.  Thus, legislators reading the fiscal note would likely have understood the Act to cover at least some daily substitutes.[18]

---

[17] The County's legislation, unlike the Act, included an express exemption for certain workers who "[do] not have a regular work schedule with the employer" and have to "contact[] the employer for work assignments."  Mont. Co. Code § 27-76(b).

[18] The two school districts that submitted written testimony opposing the bill seemed to have the same understanding that the bill, at least as originally drafted, would cover at least some daily substitute employees even though they lacked a fixed schedule.  *See, e.g.*, *Hearing on H.B. 1* (written testimony of Anne Arundel County and Harford County Boards of Education).  Although the testimony of private parties during committee hearings—particularly those that opposed the legislation—is not always reliable evidence of legislative intent, the testimony here confirms our understanding of the fiscal note.

Similarly, the reference to Montgomery County's ordinance reinforces that, had the General Assembly wanted to exclude all employees without a regular schedule, it had two models for how to accomplish that goal: (1) Montgomery County's law, which included an express exemption for certain on-call workers who lack "a regular work schedule," Mont. Co. Code § 27-76(b), and (2) a bill proposed by the Governor as an alternative to the Act that would have similarly exempted some on-call workers who do "not have a regular work schedule with the employer." H.B. 382, 2017 Leg., Reg. Sess. (first reader). Yet the Legislature chose not to use that language, excluding only those employees who "regularly work[]" less than 12 hours a week (as well as a narrow subset of on-call, as-needed employees "in a health or human services industry"). *See* LE § 3-1303(a). That choice again suggests that § 3-1303(a)(1) does not categorically exclude all employees without a regular work schedule or set hours.[19]

To be sure, some legislative history points in the other direction. Senator Middleton, who was the floor leader for the bill and a sponsor of the cross-filed Senate bill, suggested on the Senate floor that daily substitute teachers were not covered by the Act. *See* Senate Proceedings No. 56 (March 31, 2017); *see also* Part I.C, *supra*. The "[s]tatements of [a] legislator acting as floor manager [or as] co-sponsor of the bill . . . while not conclusive on legislative intent, are generally accorded some weight by the courts in determining the meaning of a statute." 87 *Opinions of the Attorney General* 106, 113 n.6 (2002); *see also Davis*, 426 Md. at 231 n.7 (explaining that courts rely on testimony by bill sponsors as reliable evidence of legislative intent, "especially where there were

---

[19] The General Assembly's decision to include a specific exemption for certain on-call employees suggests that it did not understand the exception for employees who regularly work less than 12 hours a week to categorically exclude such on-call employees. If those employees were already excluded by the "regularly works" language, the General Assembly presumably would not have needed to include the "health or human services industry" exemption. However, there was at least some evidence in the legislative record that on-call workers in the health and human services industries sometimes have a set schedule "for a limited duration," *see Hearing on H.B. 1* (written testimony of the Society for Human Resource Management), or work a set number of hours for a limited period of time, *see id.* (written testimony of MNCHA), so it is at least possible that the General Assembly included the "health or human services" exemption to clarify that those on-call workers would be excluded from the statute even when temporarily working regular schedules. Thus, we do not rely too heavily on this point.

minimal amendments to the bill . . . after that testimony"). That is because floor leaders and bill sponsors tend to know the details of their bills better than other members, so other members will often rely on their explanations when deciding how to vote. *See* Jack Schwartz and Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. Law Rev. 432, 446 (1995) (explaining that the testimony of bill sponsors is "likely to be especially reliable evidence" because it typically "reflect[s] the views of those most likely to know something about the legislation and to whom other members, for a variety of reasons, tend to defer").[20]

Here, Senator Middleton's statement is entitled to considerable weight. Because he was both the floor leader and a sponsor of the cross-filed Senate bill, some senators may have voted based on the understanding that the bill would not apply to daily substitute teachers. Taken alone, however, the Senator's statement is not conclusive, for at least two reasons. First, his statement did not purport to interpret the exception for employees who "regularly work[] less than 12 hours a week" and thus does not suggest that he read that particular exception to exclude daily substitute teachers and all other employees who lack a regular work schedule. Second, it is not clear that Senator Middleton's statement was understood by his fellow legislators to suggest that *all* daily substitutes would be excluded. Senator Middleton was responding to a question about whether the Act applied to a hypothetical substitute teacher who works "maybe a day a week or maybe four or five times a month." Senate Proceedings No. 56 (March 31, 2017). But a substitute teacher who works that infrequently will "regularly work[] less than 12 hours a week" under any possible definition of the phrase and thus would be excluded from the Act no matter how the exception were interpreted. Therefore, the legislative history, considered as a whole, does not appear to contradict our conclusion as to this exception.

---

[20] Courts do not, however, provide any significant weight to post-hoc statements made after the enactment of the bill. *See Building Materials Corp. of Am*, 428 Md. at 592. Thus, we do not rely on the statements made by Senator Middleton and Senator King in their letter to us requesting this opinion that "[w]e believe that it was the intent of the General Assembly to exclude daily substitute employees who can reject or accept the shift offered and are not guaranteed to be called to work from this law." Letter from the Honorable Nancy J. King and Thomas McClain Middleton to Brian E. Frosh (March 29, 2018).

In sum, we conclude that the exception for employees who regularly work less than 12 hours a week does not categorically exclude daily substitute teachers from the protection of the Act. We therefore turn to other provisions in the Act to see if any of them create a categorical exemption.

   2.   *As-Needed Employees in a Health or Human Services Industry*

The second potentially relevant exception provides that the Act "does not apply to" an employee who:

> (3) (i) is called to work by the employer on an as-needed basis in a health   or   human services industry;
>
> (ii) can reject or accept the shift offered by the employer;
>
> (iii) is not guaranteed to be called on to work by the employer; and
>
> (iv) is not employed by a temporary staffing agency.

LE § 3-1303(a)(3).  This exception would likely apply to daily substitute teachers if they were to qualify as employees "in a health or human services industry," because they meet all of the other criteria:  they are called to work on an "as-needed basis," may "reject or accept" their shifts, are "not guaranteed to be called on to work" by the school system, and are not "employed by a temporary staffing agency."  However, for the reasons explained below, our view is that daily substitute teachers are *not* employed "in a health or human services industry" and thus do not fall within this exception.

To determine the meaning of "a health or human services industry," we look first to the "natural and ordinary meaning" of the phrase. *Davis*, 426 Md. at 218. In doing so, it is again a "useful starting point" to examine dictionary definitions of the term. *Deibler*, 423 Md. at 67 (internal quotation marks omitted).  Here, although it appears that most dictionaries do not include a definition for "human services," there are some dictionaries that define the term to mean "programs or facilities for meeting basic health, welfare, and other needs of a society or group, as of the poor, sick, or elderly." *E.g.*, *Webster's Encyclopedic Unabridged Dictionary* 931 (1996); *The Random House Dictionary of the English Language Unabridged* 931 (2d ed. 1990).  While that

definition is theoretically broad enough to encompass the field of education—which does, after all, help to provide a societal need—that is far from the most natural way to read the definition. And more importantly, such a reading would not be consistent with how the term "human services" is used and understood elsewhere in Maryland law.

Rather, in Maryland, the term "human services" is used: (1) to describe the article of the Code that governs social service programs, public assistance programs, child protective services, elder care, help for disabled individuals, and other similar programs that focus primarily on care for vulnerable or disadvantaged groups; and (2) to describe the name of the principal department of the Executive Branch that oversees most of those programs. *See* Md. Code Ann., Hum. Servs. § 2-201. In fact, during the same legislative session that the Legislature passed the sick leave statute in question, it also changed the name of the former Department of Human Resources to the "Department of Human Services" so as to more accurately reflect the agency's mission. *See* 2017 Md. Laws, ch. 205. Therefore, when the General Assembly used the term "human services industry" in the Act, it more likely had in mind industries that provide categories of care and assistance similar to those mentioned in the Human Services Article, rather than the field of primary and secondary education.[21]

---

[21] The human services industry itself seems to have a similar understanding of the types of fields that comprise "human services." *See, e.g.*, National Organization for Human Services, *What Is Human Services?*, https://www.nationalhumanservices.org/what-is-human-services ("'Human services professional' is a generic term for people who hold professional and paraprofessional jobs in such diverse settings as group homes and halfway houses; correctional, intellectual disability, and community mental health centers; family, child, and youth service agencies[;] and programs concerned with alcoholism, drug abuse, family violence, and aging."); Arianne Sellers, *The New Human Services Industry: Changing the World for the Profit or For the Better?*, Journal of Social Innovations (Jan. 29, 2013), http://www.socialinnovations journal.org/editions/issue-13-winter-2013/74-what-works-what-doesnt/ 828-the-new-human-services-industry-changing-the-world-for-the-profit-or-for-the-better ("The human services industry umbrella encompasses a range of social and behavioral health services, such as disability programs, youth development, mental health and crisis intervention, employment and housing and child and family services. Before the 1960s, these efforts were considered largely governmental. But through welfare state growth, it became common for nonprofit

Consistent with that understanding, the General Assembly has, in other contexts, defined "human services worker" to mean a "professional employee of any public or private health or social services agency or provider," Md. Code Ann., Fam. Law § 14-101(h), and has defined "human services professional" to include "social workers," "professional counselors," "nurses," and "school *psychologists*," Hum. Servs. § 4-301(b)(1) (emphasis added), but not school *teachers*. Similarly, the General Assembly has often distinguished between the fields of education and human services. For instance, the Legislature imposed a requirement to report child abuse on "health practitioner[s], police officer[s], *educator[s]*, or *human service worker[s]*," Md. Code Ann., Fam. Law. § 5-704(a) (emphasis added), implying that "educator[s]" are not included within the term "human service worker[s]." *See also* Fam. Law. § 5-701(g) (referring separately to "[e]ducator[s] or human service worker[s]"); Md. Code Ann., Local Gov't ("LG") § 12-402(e)(2) (providing that "the county commissioners [of Calvert County] may donate an interest in surplus real property to a private, nonprofit corporation for *educational, human services*, housing, cultural, recreational, or community uses" (emphasis added)); LG § 12-406(c)(1) (providing the same power to Charles County); LE § 9-6A-09(c)(1) (recognizing that there are different college degrees offered for the fields of "education" and "human services," respectively); *but see* N.Y. Soc. Serv. Law § 488 (defining "human services professional" to include a "school official, which includes . . . school teacher"). Thus, it appears that the Maryland Legislature generally does not, and would not, understand the term "human services industry" to encompass substitute teaching for local school systems.[22]

---

organizations to serve communities through public agency funding, like Medicaid, with legislative efforts focused on fostering this partnership."); HumanServicesEdu.Org, *The Definition of Human Services*, https://www.humanservicesedu.org/definition-human-services.html (defining a human service as "a service that is provided to people in order to help them stabilize their life and find self-sufficiency through guidance, counseling, treatment and the providing for of basic needs").

[22] It also seems unlikely that the General Assembly would have referred to public education as an "industry." We recognize, however, that there may be some situations in which it is difficult to distinguish between the fields of education and human services. It is at least possible, for example, that a day-care provider or a teacher for the Head Start program could be considered part of a human services industry. Although we do not purport to draw any absolute lines here as to the

Even assuming for the sake of argument that the statutory language is ambiguous, we must again construe the statute broadly and the exception narrowly to further the broad remedial purposes behind the legislation. *Lockett*, 446 Md. at 424; *see also Blue*, 434 Md. at 695 ("When a general provision in a statute has certain limited exceptions, all doubts [typically] should be resolved in favor of the general provision rather than the exceptions." (internal quotation omitted)). Those principles counsel against any reading of "human services industry" that would stretch the phrase beyond its most natural reading to exclude an entire class of employees from the Act's protections.

Finally, if we assume the statute is ambiguous, we can also look to the legislative history. But the legislative history here is inconclusive. On one hand, the bill file suggests that, in adding the health-or-human-services exception to the Act, the General Assembly was responding to specific concerns about PRN employees raised by groups like MNCHA, the Community Behavioral Health Association, Shepard's In-Home Care, the Visiting Angels, and Kaiser Permanente, all of which naturally fit within the ordinary meaning of the health or human services industry. *See* Part I.C, *supra*. Along those lines, a summary chart prepared by DLS explained that the purpose of the provision in question was to "exempt 'PRN' workers," elaborating that "[n]urses, X-ray technicians, respiratory therapists and many other healthcare workers 'work PRN,'" without mentioning substitute teachers or education employees. *House Bill 1 Summary* at 4; *see also Ford Motor Credit Co., LLC v. Roberson*, 420 Md. 649, 666 n.13 (2011) (relying on a DLS chart in the bill file); *In re Taylor*, 312 Md. 58, 66 (1988) (same).[23]

---

meaning of "human services industry" in every context, we see no indication that the General Assembly would have understood *all* public school teachers to be employees in a "human services industry."

[23] The boards of education from Anne Arundel and Harford Counties also submitted written testimony raising similar concerns about daily substitute teachers, but there is no indication in the legislative history that the General Assembly considered their testimony in crafting the "health or human services" exception. Rather, as the director of intergovernmental relations for MABE acknowledged during the next legislative session, the local school systems did not make the full extent of their concerns about daily substitute teachers clear to the Legislature until relatively late in the legislative process during the 2017 session. *See Hearing on S.B. 304*, 2018 Leg., Reg. Sess. (oral testimony of John Woolums, MABE).

On the other hand, we are mindful of Senator Middleton's statement on the Senate floor that the Act would not apply to daily substitute teachers who are "call[ed]" by the school system and have "an option of coming in or not." Senate Proceedings No. 56 (March 31, 2017). If he was relying on the health-or-human-services exemption in § 3-1303(a)(3) to support that view, his interpretation is entitled to considerable weight in our analysis, because he was a sponsor of the bill and its floor leader. *See* Part II.B.1, *supra*. Even so, however, the "motivations of a legislative sponsor may not reflect the intent of the legislative body" as a whole. 99 *Opinions of the Attorney General* 31, 47 n.17 (2014). As explained above, we do not know for sure that other senators would have understood his remarks to support a categorical exemption for all daily substitute teachers, rather than just those who work less than 12 hours a week, *see* Part II.B.1, *supra*, and even if so, we cannot be sure that the House of Delegates shared that understanding, because no similar statement was made in the House. Thus, although Senator Middleton's views provide important evidence of legislative intent, his statements do not by themselves establish that the Legislature as a whole intended the exception for on-call workers in the "human services industry" to encompass daily substitute teachers.

To be clear, a faithful search for legislative intent when a statute is ambiguous requires us to give due consideration to statements by a sponsor about the intended effect of that statute. But that very same respect for the General Assembly also requires us to avoid inserting an exception into a statute "where none has been made by the Legislature" and where the language of the statute indicates that none was intended. *Addison v. Lochearn Nursing Home, LLC*, 411 Md. 251, 277 (2009) (quoting *Johnson v. Mayor and City Council of Baltimore*, 387 Md. 1, 15 (2005)); *see also Pappas v. Pappas*, 287 Md. 455, 465 (1980) ("A court may not under the guise of interpretation insert or omit words to make a statute express an intention not evidenced in its original form."); *Johnson*, 430 Md. at 394 (declining to follow sponsor testimony where, as here, the bill files included "contradictory" evidence weighing in both directions, and "the weight of all relevant considerations dictates the opposite conclusion" from the sponsor's testimony). In our opinion, based on the weight of all of the relevant considerations here, the exception for workers in a "health or human services industry" does not apply to daily substitute

teachers, and such teachers are not categorically excluded from the Act.[24]

Still, that does not mean that all, or even most, daily substitute teachers will be covered by the Act or will accrue sick and safe leave during each pay period. To the contrary, many (and perhaps most) daily substitute teachers will "regularly work[] less than 12 hours a week" and thus be exempt from the Act in its entirety. LE § 3-1303(a)(1). And even a substitute teacher who usually works more than 12 hours a week will not accrue leave for any 2-week pay period "in which the employee worked fewer than 24 hours total." LE § 3-1304(c)(5). We merely conclude that daily substitute teachers are not *categorically* excluded from the Act.

## C. Would Applying the Act to Daily Substitute Teachers Create an Absurd Result?

Although we believe that the best reading of the statute is that daily substitute teachers are not categorically excluded, we must consider whether that interpretation will lead to results that are "absurd, illogical, or incompatible with common sense." *Lockshin*, 412 Md. at 276. At first glance, it might seem strange for school systems to have to pay two substitute teachers—in addition to a regular teacher—for the same day of work. But, in our view, there is nothing absurd about providing paid sick leave to substitute teachers who regularly work more than 12 hours a week, especially given that some of those substitutes might work for their school

---

[24] The local school systems also raised the possibility that daily substitutes might be excluded from the Act under a separate provision stating that the Act does not "require an employer to modify an existing paid leave policy" if "the paid leave policy does not reduce employee compensation for an absence due to sick or safe leave." LE § 3-1302(b)(2). However, that provision does not apply to daily substitutes, because the systems' current policies do in fact reduce a substitute's compensation when the substitute cancels or declines a job. After all, a substitute is not paid if the substitute does not work, so the loss of a work day necessarily reduces the substitute's compensation. This provision instead applies to workers like adjunct faculty members at institutions of higher education, who generally receive a set stipend for an entire semester, regardless of whether they have to cancel a class. *See* Letter from Sandra Benson Brantley, Counsel to the General Assembly, to Delegate Luke Clippinger (Feb. 15, 2018); *see also* DLLR, *Maryland Healthy Working Families Act: Frequently Asked Questions* at 13 (explaining that employees who work on commission may also fall into this category).

system nearly every day and might rely on their income from substitute teaching to earn a living.

In fact, at least three other states—California, Arizona, and Oregon—seem to guarantee paid sick leave to their daily substitute teachers. *See, e.g.*, Cal. Labor Code, Art. 1.5 § 246 (covering all but a few employees who work "30 or more days a year"); Ariz. Rev. Stat. Ann. §§ 23-362, 372 (excluding only persons who are "employed by a parent or a sibling" or "employed performing babysitting services in the employer's home on a casual basis"); Industrial Comm'n of Ariz., *Frequently Asked Questions About Minimum Wage and Earned Paid Sick Time*, at 16 (July 3, 2017) (outlining the circumstances under which "on-call employees" in Arizona may use paid sick leave); Oregon Sch. Bd. Ass'n, Oregon's Sick Time Frequently Asked Questions, at 10 (Sept. 26, 2016).[25] Under those statutes, school systems in California and Oregon have apparently already developed procedures for substitute teachers to accrue and use sick leave.[26] Given that other

---

[25] In Oregon, some school systems have said that daily substitute teachers may earn leave but are entitled to use accrued leave only when they were already scheduled *in advance* for that day. Eugene Sch. Dist., *Substitute Sick Time*, https://www.4j.lane.edu/hr/substitute-sick-time/; North Clackamas Sch. Dist., *Oregon Sick Time Rule Guidance in North Clackamas Sch. Dist.*, https://www.nclack.k12.or.us/sites/default/files/fileattachments/business_services/page/7791/ncsdoregon_sick_leave_rule_guidance.pdf. It is not clear, however, whether those policies are based on an interpretation of Oregon's sick leave law or on some other ground. Somewhat similarly, the State of Washington has apparently interpreted its paid sick leave law to allow daily substitutes to accrue sick leave but to prevent them from using sick leave unless they are "required" to work on a particular day. Porter Foster Rorick LLP, *Washington Public School Substitutes and Coaches under Initiative 1433* (Jan. 19, 2018), https://pfrwa.com/HT/180118paid.sick.leave.pdf. Because substitute teachers are almost never "required" to work, however, Washington's interpretation affords little benefit to most daily substitutes, unless they are eventually hired as a regular teacher and may carry over accrued leave that they earned as a substitute.

[26] *See, e.g.*, Riverside Unified Sch. Dist., *Substitute Teacher Handbook*, at 18 (April 2017), http://www.riversideunified.org/UserFiles/Servers/Server_580721/File/Departments/Personnel/Substitute%20Handbook%2016-17%20rev.%204-13-17.pdf; *see also* Twin Rivers Unified School District, *Substitute Sick Leave*, at 1 (May 2018), http://www.twinriversusd.org/documents/Operations/Human%20Resources/Substitute%20Services/Substitute%20Information/Substitute%20Sick%20Leave%20Information.pdf; West Contra Costa Unified School

states are providing paid sick leave to daily substitutes, it is difficult to see how providing the same type of leave to Maryland substitutes would be an absurd result.

We recognize that some provisions of the Act may be difficult to apply in practice to on-call employees like daily substitute teachers. *See* Stellman Letter at 6. For instance, the Act gives employers discretion to provide employees with the "full amount" of their sick and safe leave at the beginning of the year that the employees "would earn over the course of the year." LE § 3-1304(d). That provision cannot practically be applied to daily substitutes when the school systems do not know how many hours the substitute will earn during the year. Similarly, the Act allows an employer to require that an employee provide up to 7 days "reasonable advance notice" of the employee's intent to take sick leave when the need for leave is foreseeable. LE § 3-1305(b)(1). If, however, a daily substitute teacher provides advance notice of an intent to take leave when that substitute is not already scheduled for an assignment and the school system does not offer the substitute an assignment, it is not clear whether the substitute could use his or her leave under those circumstances.

However, the mere existence of questions about how to apply some provisions of the Act does not mean that the Act as a whole cannot be applied to daily substitutes. The General Assembly can seldom foresee how a statute will apply in every case or how all the pieces of a statutory scheme will fit together in every situation. In part for that reason, the Legislature gave the Commissioner authority to promulgate regulations to clarify how the Act will be applied where the statute leaves some ambiguity. Although it is not our role to make policy on behalf of DLLR, and it is beyond the scope of this opinion to advise on the legality of any hypothetical interpretation by DLLR, we think the Commissioner has at least some discretion to clarify how the statute will apply to daily substitute teachers in particular circumstances. The Commissioner might even have latitude to interpret the statute so as to impose some limits on when daily substitutes can use their accrued sick and safe leave, if necessary to ensure that the statutory

---

District, *Substitute Sick Leave*, https://www.wccusd.net/Page/6247; Eugene Sch. Dist., *Substitute Sick Time*, https://www.4j.lane.edu/hr/substitute-sick-time/; North Clackamas Sch. Dist., *Oregon Sick Time Rule Guidance in North Clackamas School District*, https://www.nclack.k12.or.us/sites/default/files/fileattachments/business_services/page/7791/ncsd_oregon_sick_leave_rule_guidance.pdf.

scheme functions in a workable fashion, consistent with the legislative purpose.[27]

## III

### Conclusion

In sum, we conclude that the Act does not categorically exclude daily substitute teachers from its scope. Although many daily substitutes will not be entitled to earn sick leave because they regularly work less than 12 hours a week, there will be at least some substitutes entitled to leave under the Act. That said, the Commissioner may have authority to interpret the Act to impose some limits on when daily substitutes may use leave they have accrued.

Brian E. Frosh
Attorney General of Maryland

Patrick B. Hughes
Chief Counsel,
    Opinions and Advice

*Elizabeth M. Kameen, Assistant Attorney General, contributed significantly to the preparation of this Opinion.

---

[27] For example, although we do not decide the legality of any particular interpretation here, the Commissioner might be able to interpret the statute to impose certain limits on the ability of a substitute teacher to use sick leave when the substitute is not already scheduled to work on a particular day. *See* footnote 25, *supra* (noting that at least some Oregon school districts have adopted similar policies). We also note that, although the school systems have expressed concerns about facing penalties under the Act, *see* Stellman Letter at 3 n.3, the Act gives the Commissioner some discretion in enforcing the statute.